09-0599-cv(L), 09-0609-cv(CON)
Green Party of Connecticut v. Garfield

**UNITED STATES COURT OF APPEALS**
**FOR THE SECOND CIRCUIT**

August Term 2009

(Argued January 13, 2010                     Decided July 13, 2010)

Docket Nos. 09-0599-cv(L), 09-0609-cv(CON)

GREEN PARTY OF CONNECTICUT, S. MICHAEL DEROSA, LIBERTARIAN PARTY OF CONNECTICUT, ELIZABETH GALLO, JOANNE P. PHILIPS, ANN C. ROBINSON, ROGER C. VANN, ASSOCIATION OF CT LOBBYISTS, and BARRY WILLIAMS,

*Plaintiffs-Appellants*,

v.

JEFFREY GARFIELD, RICHARD BLUMENTHAL, PATRICIA HENDEL, ROBERT N. WORGAFTIK, JACLYN BERNSTEIN, REBECCA M. DOTY, ENID JOHNS ORESMAN, DENNIS RILEY, MICHAEL RION, SCOTT A. STORMS, SISTER SALLY J. TOLLES, and BENJAMIN BYCEL,

*Defendants-Appellees*,

AUDREY BLONDIN, TOM SEVIGNY, COMMON CAUSE OF CT, and CONNECTICUT CITIZEN ACTION GROUP,

*Intervenor-Defendants-Appellants*.

Before KEARSE, CABRANES, and HALL, *Circuit Judges*.

Appeal from a February 11, 2009 partial final judgment of the United States District Court for the District of Connecticut (Stefan R. Underhill, *Judge*) entered after the Court granted summary judgment to defendants, upholding several provisions of Connecticut's Campaign Finance Reform Act (CFRA) against a First Amendment challenge.

We affirm the judgment of the District Court insofar as it upheld certain provisions banning state contractors and associated individuals from making campaign contributions to candidates for state office.

1

We reverse the judgment of the District Court insofar as it upheld certain provisions (a) banning lobbyists from making campaign contributions and (b) banning contractors and lobbyists from soliciting contributions on behalf of candidates for state office. We hold that those provisions violate the First Amendment.

In a judgment entered September 2, 2009, the District Court disposed of additional claims challenging Connecticut's Citizen Election Program, a part of the CFRA that provides public funds to candidates running for state office. We address an appeal of the September 2, 2009 judgment in a separately filed opinion.

R. BARTLEY HALLORAN, Farmington, Connecticut, *for plaintiffs-appellants Association of CT Lobbyists and Barry Williams*.

MARK J. LOPEZ, Lewis, Clifton & Nikolaidis, P.C., New York, New York (Benjamin Sahl, American Civil Liberties Union Foundation, New York, New York and David J. McGuire, American Civil Liberties Union Foundation, Hartford, Connecticut, *on the brief*), *for the remaining plaintiffs-appellants*.

IRA M. FEINBERG, Hogan & Hartson LLP, New York, New York (Richard Blumenthal, Attorney General, Perry Zinn Rowthorn and Maura Murphy Osborne, Assistant Attorneys General, Office of the Attorney General of the State of Connecticut, Hartford, Connecticut; Monica Y. Youn and Angela Migally, Brennan Center for Justice, NYU School of Law, New York, New York; and David Dunn, Hogan & Hartson LLP, New York, New York, *on the brief*), *for defendants-appellees and intervenor-defendants-appellees*.

Justin R. Clark and Peter J. Martin, Pepe & Hazard LLP, Hartford, Connecticut, *for amicus curiae the Republican Party of Connecituct in support of plaintiffs-appellants*.

JOSÉ A. CABRANES, *Circuit Judge*:

This is the second of two opinions in which we consider a constitutional challenge to certain provisions of Connecticut's Campaign Finance Reform Act (CFRA).

As we describe in our first opinion, the CFRA was enacted in 2005 as a comprehensive effort to bring about campaign finance reform in Connecticut. In our first opinion, which we file separately, we consider a challenge to the Citizens Election Program (CEP), a part of the CFRA that provides public funds to candidates running for state office. *See Green Party of Conn. v. Garfield*, No. 09-3760-cv(L), __ F.3d __ (2d Cir. July 13, 2010). We consider here a challenge to provisions of the CFRA that ban campaign contributions and the solicitation of campaign contributions by state contractors, lobbyists, and their families.

Following cross-motions for summary judgment, the United States District Court for the District of Connecticut (Stefan R. Underhill, *Judge*) determined that each of the challenged provisions was consistent with the First Amendment. *See Green Party of Conn. v. Garfield*, 590 F. Supp. 2d 288 (D. Conn. 2008) ("*Green Party I*"). We affirm part of that decision, as we hold that the CFRA comports with the First Amendment insofar as it bans contributions by state contractors, "prospective" state contractors, the "principals" of contractors and prospective state contractors,[1] and the spouses and dependent children of those individuals.

We also reverse part of the District Court's decision, as we hold that the CFRA violates the First Amendment insofar as it bans contributions by lobbyists and their families and insofar as it prohibits contractors, lobbyists, and their families from soliciting contributions on behalf of candidates.

---

[1] We use the term "principal" in this opinion to mean those individuals and entities defined in Conn. Gen. Stat. § 9-612(g)(1)(F)(i)-(iv), (vi). Although it is included in the statutory definition, we do not use the term "principal" to mean the "spouse" or "dependent child" of a contractor. *See id.* § 9-612(g)(1)(F)(v). We analyze the CFRA's effect on a contractors' spouses and dependent children separately from the statute's effect on "principals." The opinion will refer to the "spouses" or the "dependent children" of contractors by using those terms or by using the term "families."

**BACKGROUND**

We first describe the history of the CFRA. We then outline the challenged provisions and briefly recount the procedural history of this action.

**I.     The History of the CFRA**

In our first opinion addressing the CFRA, we summarized the history of the statute:

> The CFRA . . . was passed in response to several corruption scandals in Connecticut. [*See Green Party of Conn. v. Garfield*, 648 F. Supp. 2d 298, 306-07 (D. Conn. 2009) ("*Green Party II*").] The most widely publicized of the scandals involved Connecticut's former governor, John Rowland. In 2004, Rowland was accused of accepting over $100,000 worth of gifts and services from state contractors, including vacations, flights on a private jet, and renovations to his lake cottage. Rowland accepted the gifts, it was alleged, in exchange for assisting the contractors in securing lucrative state contracts. Rowland resigned amidst the allegations, and in 2005 pleaded guilty—along with two aides and several contractors—to federal charges in connection with the scandal. Rowland was fined and sentenced to a year and a day in federal prison. *See id.* at 307.

> Sadly, the ignominy of public corruption was not limited to Rowland. As the District Court discussed in detail, the "Rowland scandal was but one of the many corruption scandals involving elected officials in state and local government that helped earn the state the nickname 'Corrupticut.'" *See id.* at 307-08 (cataloging the scandals); *see also id.* at 307 & n.9 (discussing the decline of the reputation of Connecticut's state government).

> It was in the wake of those scandals that Connecticut lawmakers resolved to enact "expansive campaign finance reforms." *Id.* at 309. In the summer of 2005, Governor M. Jodi Rell established the Campaign Finance Reform Working Group (the "Working Group"), a collection of six state representatives and six state senators who were charged with drafting a new campaign finance reform law. After holding televised hearings for three months, the Working Group proposed an expansive bill, much of which would be incorporated into the final version of the CFRA. *See id.* at 309-10.

> In the fall of 2005, Governor Rell called a special session of the General Assembly for the sole purpose of considering the Working Group's proposed bill. After a month of debate, the General Assembly passed the CFRA, and Governor Rell signed it into law. *See id.* at 310-11. As the District Court set forth in detail, several contemporaneous statements from General Assembly members, as well as Governor Rell, explain that the CFRA

4

was passed "to combat actual and perceived corruption in state government." *Id.* at 311.

*Green Party*, No. 09-3760-cv(L), at __ , __ F.3d at __ .

## II.    The Challenged Provisions

The CFRA is a broad-ranging and complex statute, and plaintiffs challenge only parts of the law. Put succinctly, the challenged provisions of the CFRA prohibit state contractors and certain lobbyists from (1) making campaign contributions to candidates for state office and (2) soliciting campaign contributions on behalf of candidates for state office. Violations of those prohibitions are punishable by civil penalties and criminal sanctions. *See* Conn. Gen. Stat. §§ 9-610(j), 9-622(8), 9-622(10), 9-623(a).

### A.    Contribution Bans

First, the CFRA prohibits state contractors and lobbyists from making campaign contributions to candidates for state office. *See* Conn. Gen. Stat. §§ 9-610(g), 9-612(g)(2)(A)-(B).

The CFRA's ban on *contractor* contributions applies to any "person, business entity or nonprofit organization that enters into a state contract." *Id.* § 9-612(g)(1)(D). It also applies to any "prospective" contractor; to any "principal" of a contractor or prospective contractor; and to the "spouse" or "dependent child"[2] of a contractor, a prospective contractor, or a principal of a contractor or prospective contractor. *Id.* § 9-612(g)(2). (We discuss these terms in detail below.)

In addition, the ban on contractor contributions is what might be called "branch specific." If the contract in question is "with or from a state agency in the executive branch," the contractor may contribute to a candidate for the General Assembly but not to a candidate for an executive office (*i.e.*, a candidate for "Governor, Lieutenant Governor, Attorney General, State Comptroller,

---

[2] The prohibition on contributions by dependent children applies only to "a dependent child who is eighteen years of age or older." Conn. Gen. Stat. § 9-612(g)(1)(F)(v).

Secretary of the State or State Treasurer"). *Id.* § 9-612(g)(2)(A). If the contract in question is "with or from the General Assembly," the contractor may contribute to a candidate for an executive office but not to a candidate for the General Assembly. *Id.* § 9-612(g)(2)(B).[3] Nonetheless, any "holder, or principal of a holder of a valid prequalification certificate," such a certification being required in order to bid or perform work on certain high-cost, state-funded projects, is precluded from contributing to candidates for either branch of government. *Id.* §§ 9-612(g)(2)(A)-(B). Further, all individuals and entities covered by the contractor ban are prohibited from contributing to any state or town "[p]arty committee." *Id.* § 9-601(1)-(2).

---

[3] The ban on contractor contributions reads in full:

> (A) No state contractor, prospective state contractor, principal of a state contractor or principal of a prospective state contractor, with regard to a state contract or a state contract solicitation with or from a state agency in the executive branch or a quasi-public agency or a holder, or principal of a holder of a valid prequalification certificate, shall make a contribution to, or solicit contributions on behalf of (i) an exploratory committee or candidate committee established by a candidate for nomination or election to the office of Governor, Lieutenant Governor, Attorney General, State Comptroller, Secretary of the State or State Treasurer, (ii) a political committee authorized to make contributions or expenditures to or for the benefit of such candidates, or (iii) a party committee[.]

> (B) No state contractor, prospective state contractor, principal of a state contractor or principal of a prospective state contractor, with regard to a state contract or a state contract solicitation with or from the General Assembly or a holder, or principal of a holder, of a valid prequalification certificate, shall make a contribution to, or solicit contributions on behalf of (i) an exploratory committee or candidate committee established by a candidate for nomination or election to the office of state senator or state representative, (ii) a political committee authorized to make contributions or expenditures to or for the benefit of such candidates, or (iii) a party committee[.]

Conn. Gen. Stat. § 9-612(g)(2).

6

The CFRA's ban on *lobbyist* contributions applies to any "communicator lobbyist," defined (a) as "someone compensated for lobbying over the threshold amount of $ 2,000 in any calendar year," *Green Party I*, 590 F. Supp. 2d at 295 n.3 (quoting State Elections Enforcement Commission (SEEC) Declaratory Ruling 2006-1, at 2), and (b) as "a lobbyist who communicates directly or solicits others to communicate with an official or his staff in the legislative or executive branch of government or in a quasi-public agency for the purpose of influencing legislative or administrative action," Conn. Gen. Stat. § 1-91(v). The ban on lobbyist contributions also applies to the "spouse" or "dependent child" of a communicator lobbyist. *See id.* § 9-610(g) (applying the ban to the "immediate family" of a communicator lobbyist); *id.* § 9-601(24) (defining "[i]mmediate family" as "the spouse or a dependent child of an individual").[4]

## B.     Solicitation Bans

The CFRA also prohibits contractors and lobbyists from "solicit[ing]" campaign contributions "on behalf of" candidates for state office. *See* Conn. Gen. Stat. §§ 9-610(h), 9-612(g)(2)(A)-(B).

---

[4] The ban on lobbyist contributions reads in full:

> No communicator lobbyist, member of the immediate family of a communicator lobbyist, or political committee established or controlled by a communicator lobbyist or a member of the immediate family of a communicator lobbyist shall make a contribution or contributions to, or for the benefit of (1) an exploratory committee or a candidate committee established by a candidate for nomination or election to the office of Governor, Lieutenant Governor, Attorney General, State Comptroller, State Treasurer, Secretary of the State, state senator or state representative, (2) a political committee established or controlled by any such candidate, (3) a legislative caucus committee or a legislative leadership committee, or (4) a party committee.

Conn. Gen. Stat. § 9-610(g).

Like the CFRA's ban on contributions, the ban on the solicitation of contributions applies not only to current state contractors, but also to any "prospective" contractor; to any "principal" of a contractor or prospective contractor; and to the "spouse" or "dependent child" of a contractor, a prospective contractor, or a principal of a contractor or prospective contractor. *Id.* § 9-612(g)(2).[5] The solicitation ban also applies to any "communicator lobbyists" and to the "spouse" or "dependent child" of such a lobbyist. *Id.* §§ 9-601(24), 9-610(h).[6]

The term "solicit" is defined by statute to include, among other things, "requesting that a contribution be made," "participating in any fund-raising activities for a candidate," and "bundling contributions" for a candidate. *Id.* § 9-601(26). Excluded from the statutory definition of "solicit" is, among other things, "making a contribution that is otherwise permitted under this chapter" and "informing any person of a position taken by a candidate." *Id.*[7]

---

[5] For the full version of the ban on the solicitation of contributions by contractors, see note 3, *ante*.

[6] The ban on the solicitation of contributions by lobbyists reads in full:

> No communicator lobbyist, immediate family member of a communicator lobbyist, agent of a communicator lobbyist, or political committee established or controlled by a communicator lobbyist or any such immediate family member or agent shall solicit (1) a contribution on behalf of a candidate committee or an exploratory committee established by a candidate for the office of Governor, Lieutenant Governor, Attorney General, State Comptroller, State Treasurer, Secretary of the State, state senator or state representative, a political committee established or controlled by any such candidate, a legislative caucus committee, a legislative leadership committee or a party committee, or (2) the purchase of advertising space in a program for a fund-raising affair sponsored by a town committee, as described in subparagraph (B) of subdivision (10) of section 9-601a.

Conn. Gen. Stat. § 9-610(h).

[7] The full statutory definition of "solicit" reads as follows:

> "Solicit" means (A) requesting that a contribution be made, (B) participating

8

The CFRA is administered and interpreted by a state agency known as the State Elections Enforcement Commission (SEEC). The SEEC has issued a "declaratory ruling" that clarifies the scope of the CFRA's solicitation ban. According to the SEEC, a contractor or lobbyist may, consistent with the CFRA's solicitation ban, engage in a number of political activities; for example, a contractor or lobbyist may "[v]olunteer for a . . . candidate's political campaign," "[e]xpress support for a candidate," "[r]un for office," or "[b]e the spouse or dependent child of someone running for office." *Green Party I*, 590 F. Supp. 2d at 298 (quoting SEEC Declaratory Ruling 2006-1, at 5-6).

## III.    This Action

Plaintiffs-appellants ("plaintiffs") brought this action in 2006 claiming that certain provisions of the CFRA violated the First and Fourteenth Amendments to the United States Constitution. Plaintiffs also claimed that the challenged provisions violated the Connecticut Constitution.

### A.    The Parties

We described the parties to this action in our first opinion:

> Plaintiffs include two minor parties operating in Connecticut: the Green Party of Connecticut and the Libertarian Party of Connecticut. Plaintiffs also include several Connecticut-based lobbyists and state

---

in any fund-raising activities for a candidate committee, exploratory committee, political committee or party committee, including, but not limited to, forwarding tickets to potential contributors, receiving contributions for transmission to any such committee or bundling contributions, (C) serving as chairperson, treasurer or deputy treasurer of any such committee, or (D) establishing a political committee for the sole purpose of soliciting or receiving contributions for any committee. "Solicit" does not include (i) making a contribution that is otherwise permitted under this chapter, (ii) informing any person of a position taken by a candidate for public office or a public official, (iii) notifying the person of any activities of, or contact information for, any candidate for public office, or (iv) serving as a member in any party committee or as an officer of such committee that is not otherwise prohibited in this subdivision.

Conn. Gen. Stat. § 9-601(26).

contractors . . . . *See Green Party II*, 648 F. Supp. 2d at 302-06; J.A. [No. 09-3760-cv(L)] 49-52 (Compl. ¶¶ 10-17).[8]

Defendants-[appellees] ("defendants") include Jeffrey Garfield, who is named in his official capacity as the Executive Director and General Counsel of the State Elections Enforcement Commission, and Richard Blumenthal, who is named in his official capacity as the Attorney General of the State of Connecticut. *See Green Party II*, 648 F. Supp. 2d at 306; J.A. [No. 09-3760-cv(L)] 52 (Compl. ¶¶ 18-19).

The parties in this action also include several individuals and entities who successfully moved to intervene as defendants. The intervenor-defendants-appellants include three former major-party candidates for state office and two advocacy groups: Connecticut Common Cause and Connecticut Citizens Action Group. *See Green Party II*, 648 F. Supp. 2d at 306. The intervenor-defendants defend the constitutionality of the [challenged provisions of the CFRA].

*Green Party*, No. 09-3760-cv(L), at __ , __ F.3d at __ .

## B.    The Claims

We also described plaintiffs' claims in our first opinion:

Plaintiffs have organized their claims into five counts.[9] In Count One, plaintiffs claim that the CEP's qualification criteria and distribution formulae, Conn. Gen. Stat. §§ 9-702(b), 704-05, violate the First Amendment and the Equal Protection Clause of the Fourteenth Amendment by invidiously "discriminat[ing]" against minor parties and their candidates. *See* J.A. 66 [No. 09-3760-cv(L)] (Compl. ¶ 53). In Counts Two and Three, plaintiffs assert First Amendment challenges to the CEP's excess expenditure provision, Conn. Gen. Stat. § 9-713 (Count Two), and the CEP's independent expenditure provision, *id.* § 9-714 (Count Three). *See* J.A. [No. 09-3760-cv(L)] 66-67 (Compl. ¶¶ 54-55).

---

[8]  Citations to the "Complaint" are to the amended complaint filed by the Green Party of Connecticut and others on September 29, 2006.

[9]  As we noted in our first opinion, there are two operative complaints in this action: (1) an "amended complaint" filed by the Green Party of Connecticut and others on September 29, 2006, and (2) a "second amended complaint" filed by the Association of Connecticut Lobbyists and Barry Williams on January 16, 2007. In discussing the various "counts" asserted by plaintiffs, we refer to the counts contained in the complaint filed by the Green Party on September 29, 2006. *See* note 8, *ante*. Count Four of the Green Party's complaint is, for all relevant purposes, identical to the claims raised in the complaint filed by the Association of Connecticut Lobbyists.

In Counts Four and Five, plaintiffs assert First Amendment challenges to aspects of the CFRA that do *not* involve the CEP. In Count Four, plaintiffs challenge the CFRA's bans on contributions (and the solicitation of contributions) by registered lobbyists, state contractors, and their families. Conn. Gen. Stat. §§ 9-610(g)(h), 9-612(g). In Count Five, plaintiffs challenge disclosure requirements imposed by the CFRA on state contractors. *Id.* § 9-612(h)(2); *see* J.A. 67 (Compl. ¶¶ 56-57).

*Green Party*, No. 09-3760-cv(L), at __ , __ F.3d at __ .

Our first opinion addresses Counts One, Two, and Three. This opinion addresses Count Four. Plaintiffs have not pursued Count Five in these appeals; thus we do not address it.

### C.    Proceedings in the District Court

The District Court disposed of plaintiffs' claims by means of two separate judgments. First, following cross-motions for summary judgment, the Court granted summary judgment to defendants on Count Four, holding that the CFRA's contribution and solicitation bans did not violate the First Amendment. *See Green Party I*, 590 F. Supp. 2d 288. The Court evaluated each of the challenged provisions under the so-called "closely drawn" standard, *see Fed. Election Comm'n v. Beaumont*, 539 U.S. 146, 162 (2003), and held that in light of Connecticut's recent corruption scandals, each aspect of the contribution and solicitation bans were "closely drawn to the state's sufficiently important state interest of preventing actual and perceived corruption," *Green Party I*, 590 F. Supp. 2d at 294.

On February 11, 2009, the District Court entered a partial final judgment for defendants with respect to Count Four. *See* Fed. R. Civ. P. 54(b). Plaintiffs filed a timely appeal of that partial final judgment, which we address in this opinion.

The Court then held a bench trial and, on September 2, 2009, entered a judgment in plaintiffs' favor with respect to Counts One, Two, and Three. *See Green Party of Conn. v. Garfield* ("*Green Party II*"), 648 F. Supp. 2d 298 (D. Conn. 2009). Defendants filed a timely appeal of the

11

District Court's September 2, 2009 judgment (2d Cir. Docket No. 09-3760-cv(L)), which we address in our first, separately filed opinion.

## DISCUSSION

We conduct a *de novo* review of a District Court's decision to grant summary judgment.  *See, e.g.*, *Jeffreys v. City of N.Y.*, 426 F.3d 549, 553 (2d Cir. 2005).  Summary judgment is appropriate if "there is no genuine issue as to any material fact and . . . the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c)(2).

## I.	The CFRA's Contribution Bans

We first consider whether the provisions of the CFRA that prohibit state contractors, lobbyists, and associated individuals from making campaign contributions to candidates for state office violate the First Amendment.

### A.	The Standard for Evaluating the CFRA's Contribution Bans

In a long line cases beginning with *Buckley v. Valeo*, 424 U.S. 1 (1976), the Supreme Court has distinguished laws restricting campaign *expenditures* and campaign-related *speech* from laws restricting campaign *contributions*.  The Court has determined that laws limiting campaign *expenditures* and campaign-related *speech* "impose significantly more severe restrictions on protected freedoms of political expression and association than do" laws limiting campaign contributions.  *Id.* at 23.  As a result, the Court has evaluated laws limiting campaign expenditures and campaign-related speech under the "strict scrutiny" standard, which "requires the Government to prove that the restriction furthers a compelling interest and is narrowly tailored to achieve that interest."  *Citizens United v. Fed. Election Comm'n*, 130 S. Ct. 876, 898 (2010) (quotation marks omitted).

For laws limiting campaign *contributions*, by contrast, the Court has conducted a "relatively complaisant review under the First Amendment."  *Beaumont*, 539 U.S. at 161.  Such laws, the Court

has concluded, are "merely 'marginal' speech restrictions," since contributions "lie closer to the edges than to the core of political expression." *Id.* Thus, "instead of requiring contribution regulations to be narrowly tailored to serve a compelling governmental interest," a law limiting contributions "passes muster if it satisfies the lesser demand of being 'closely drawn' to match a 'sufficiently important interest.'" *Id.* at 162 (quoting *Nixon v. Shrink Mo. Gov't PAC*, 528 U.S. 377, 387-88 (2000)) (some quotation marks omitted); *see also Buckley*, 424 U.S. at 25.

The Court has always applied that lower standard—often referred to as the "closely drawn" standard—to evaluate First Amendment challenges to laws restricting campaign contributions. *See, e.g.*, *Randall v. Sorrell*, 548 U.S. 230, 253 (2006) (plurality opinion); *McConnell v. Fed. Election Comm'n*, 540 U.S. 93, 138 n.40 (2003), *overruled in part on other grounds by Citizens United*, 130 S. Ct. at 913; *Beaumont*, 539 U.S. at 161. The Court has applied the closely drawn standard even when the law in question imposed an outright *ban* on contributions. In *Beaumont*, for instance, the Court applied the closely drawn standard in upholding a federal law that banned all campaign contributions made by corporations. *See id.* at 149, 161-62.

Although the Court's campaign-finance jurisprudence may be in a state of flux (especially with regard to campaign-finance laws regulating corporations), *Beaumont* and other cases applying the closely drawn standard to contribution limits remain good law. Indeed, in the recent *Citizens United* case, the Court overruled two of its precedents and struck down a federal law banning independent campaign *expenditures* by corporations, but it explicitly declined to reconsider its precedents involving campaign *contributions* by corporations to candidates for elected office. *See* 130 S. Ct. at 909 ("Citizens United has not made direct contributions to candidates, and it has not suggested that the Court should reconsider whether contribution limits should be subjected to rigorous First Amendment scrutiny.").

We will, therefore, evaluate the contribution bans imposed by the CFRA under the closely drawn standard. We will uphold the statutory bans against plaintiffs' First Amendment challenge only if they are closely drawn to achieve a "sufficiently important" government interest. *Beaumont*, 539 U.S. at 162 (quotation marks omitted).

In so doing, we reject plaintiffs' argument that we must apply strict scrutiny because the provisions at issue here are *bans*, as opposed to mere *limits*. Such an argument was explicitly rejected in *Beaumont* (which, as discussed above, remains binding precedent). *See id.* at 162. As *Beaumont* concisely explained: "It is not that the difference between a ban and a limit is to be ignored; it is just that the time to consider it is when applying scrutiny at the level selected, not in selecting the standard of review itself." *Id.* Accordingly, the closely drawn standard applies to the bans on contributions imposed by the CFRA. As we discuss in greater detail below, however, the fact that the provisions impose outright bans—and not limits—on contributions is a factor we will consider when we "apply[] scrutiny at the level selected" and determine whether the provisions are, in fact, closely drawn to achieve the state's interests. *Id.*

**B.      The Ban on Contributions by Contractors and Associated Individuals**

In assessing the CFRA's ban on contributions by *contractors* and associated individuals, we first determine whether the ban furthers a "sufficiently important" interest; we then determine whether the ban is closely drawn to achieve that interest. *See Beaumont*, 539 U.S. at 162

**1.      Do the Bans on Contractor Contributions Further a "Sufficiently Important" Interest?**

As set forth above, the Connecticut General Assembly enacted the CFRA's ban on contractor contributions in response to a series of scandals in which contractors illegally offered bribes, "kick-backs," and campaign contributions to state officials in exchange for contracts with the

14

state. The ban was designed to combat both actual corruption and the appearance of corruption caused by contractor contributions. *See Green Party I*, 590 F. Supp. 2d at 303.

Such an "anticorruption" interest, *see Citizens United*, 130 S. Ct. at 903, has been recognized as a legitimate reason to restrict campaign contributions. Beginning with *Buckley*, the Supreme Court has repeatedly held that laws limiting campaign contributions can be justified by the government's interest in addressing both the "actuality" and the "appearance" of corruption. 424 U.S. at 26; *accord McConnell*, 540 U.S. at 143 ("Our cases have made clear that the prevention of corruption or its appearance constitutes a sufficiently important interest to justify political contribution limits.").

The record before us, moreover, shows that the General Assembly had good reason to be concerned about both the "actuality" and the "appearance" of corruption involving contractors. Connecticut's recent corruption scandals showed that contributions by contractors could lead to corruption. And it took no great leap of reasoning to infer that those scandals created a strong *appearance* of impropriety in the transfer of any money between contractors and state officials—whether or not the transfer involved an illegal *quid pro quo*. The scandals reached the highest state offices, leading to the resignation and eventual criminal conviction and imprisonment of the state's governor. They were, as a result, covered extensively by local media and garnered the attention of national media outlets as well. *See Green Party II*, 648 F. Supp. 2d at 307 n.9 (providing examples of newspaper articles covering Connecticut's corruption scandals). Thus, corruption spurred by state contractors became a salient political issue in Connecticut, and there arose an appearance of impropriety with respect to all contractor contributions. *See* Meadow Decl. ¶ 30 (May 24, 2007) (describing a public opinion poll in which 76% of Connecticut voters believed that "campaign contributions Governor Rowland received influenced him in awarding government contracts").

15

Accordingly, we conclude that the CFRA's ban on contractor contributions furthers "sufficiently important" government interests. *See Beaumont*, 539 U.S. at 162. There is sufficient evidence in the record of actual corruption stemming from contractor contributions, and in light of the widespread media coverage of Connecticut's recent corruption scandals, the General Assembly also faced a manifest need to curtail the appearance of corruption created by contractor contributions.

### 2. Are the Bans on Contractor Contributions "Closely Drawn" to Achieve the State's Interest?

The more difficult question, however, is whether each aspect of the CFRA's ban on contractor contributions is closely drawn to achieve the state's anticorruption interest. *See Beaumont*, 539 U.S. at 162. We first describe the standard for determining whether a statute is closely drawn to achieve the state's interest, and we then apply that standard to the provisions of the CFRA banning contributions of state contractors, prospective state contractors, principals of state contractors, and the spouses and dependent children of state contractors.

### a. The Standard for Determining Whether a Statute is "Closely Drawn"

On only one occasion has the Supreme Court held that a contribution limit was not closely drawn to the government's interests. In *Randall v. Sorrell*, the Supreme Court applied a multifactor test and struck down a Vermont law that limited the amount of money that any single individual could contribute to a campaign for state office. *See* 548 U.S. at 253-62. A plurality of the Court found the law "too restrictive" because, among other things, its limits were so low that they "prevent[ed] candidates from 'amassing the resources necessary for effective [campaign] advocacy.'" *Id.* at 248, 253 (quoting *Buckley*, 424 U.S. at 21) (second alteration in *Randall*).

16

The District Court relied extensively on *Randall*'s multifactor test in determining whether the CFRA's contribution bans were "closely drawn" to the asserted government interests. *See Green Party I*, 590 F. Supp. 2d at 309-16. We disagree with that approach. *Randall* addressed *general* contribution limits that applied to *all* citizens. The law in *Randall*, for instance, prohibited *any* Vermont resident from contributing more than $400 to a candidate for governor. *See* 548 U.S. at 238. Thus *Randall*'s multifactor test was concerned primarily with the effect the contribution limits would have on the electoral system as a whole. *See, e.g., id.* at 248-49 ("[C]ontribution limits that are too low can . . . harm the *electoral process* by preventing challengers from mounting effective campaigns against incumbent officeholders, thereby reducing democratic accountability." (emphasis added)).

Here, however, plaintiffs are not challenging the provisions of the CFRA that impose general contribution limits on all Connecticut citizens. *See generally* Conn. Gen. Stat. § 9-611 (imposing, for instance, a limit of $3500 on any individual's contributions to a gubernatorial campaign). Rather, plaintiffs are challenging the provisions of the CFRA that impose contribution *bans* on discrete groups of Connecticut citizens. And unlike the situation in *Randall*, there is no serious argument here that the challenged contribution bans will harm the electoral process by stifling candidates' ability to raise sufficient campaign funds. *See* 548 U.S. at 248-49. Indeed, contributions by contractors and lobbyists have, in the past, made up only a small fraction of the total amount of money given as campaign contributions in Connecticut. *See Green Party I*, 590 F. Supp. 2d at 316.

Accordingly, the First Amendment inquiry in this case does not focus on the *electoral process*, for the issue is not—as it was in *Randall*—whether the law in question "prevent[s] candidates from 'amassing the resources necessary for effective [campaign] advocacy.'" *Randall*, 548 U.S. at 248

17

(quoting *Buckley*, 424 U.S. at 21) (second alteration in *Randall*). We will not, therefore, look to *Randall*'s multifactor test as a means of evaluating whether the CFRA's ban on contributions is closely drawn to the state's interests.

The issue, instead, is whether the CFRA's contribution bans impermissibly infringe the First Amendment rights of the discrete groups of citizens it regulates—contractors, lobbyists, and associated individuals. To address that issue, we are required to examine how the CFRA applies to the different groups of individuals it regulates and determine, in each case, whether the law is closely drawn to the state's interest in combating corruption and the appearance of corruption.

The CFRA's ban on *contractor* contributions, in particular, applies not only to individuals who currently have contracts with the state, but also to "prospective" state contractors who seek (but do not currently have) state contracts. *See* Conn. Gen. Stat. § 9-612(g)(1)(E), (2)(A)-(B). It also applies to any "principal" of an entity that has (or is seeking) contracts with the state, *see id.* § 9-612(g)(1)(F), (2)(A)-(B), and it applies to any "spouse" or "dependent child" of a covered individual, *see id.* § 9-612(g)(1)(F)(v), (1)(G), (2)(A)-(B). To survive First Amendment scrutiny, the CFRA's contractor contribution bans must be "closely drawn" to the state's anticorruption interest with respect to each of those groups of individuals.

### b.   Current and "Prospective" Contractors

The CFRA applies to contributions made by any current state contractor, as well as any "prospective state contractor," *id.* § 9-612(g)(2)(A)-(B), which is defined to include, in essence, any individual or entity that "submits a response" to a call for bids on state contracts, *see id.* § 9-612(g)(1)(E). That aspect of the CFRA is, without question, "closely drawn" to meet the state's interest in combating corruption and the appearance of corruption. It is undisputed that nearly all of the corruption scandals that gave rise to the CFRA—including the scandal involving Governor

18

Rowland—involved both current and prospective state contractors offering bribes in exchange for assistance in winning new state contracts. *See Green Party I*, 590 F. Supp. 2d at 304-06. Contributions by current and prospective state contractors, therefore, lie at the heart of the corruption problem in Connecticut.

Thus, insofar as it applies to campaign contributions made by both current and prospective state contractors, *see* Conn. Gen. Stat. § 9-612(g)(1)(D)-(E), (2)(A)-(B), the CFRA is closely drawn and survives First Amendment scrutiny.

### c. "Principals" of Contractors

If an artificial entity, rather than an individual, is awarded (or seeks) a state contract, the CFRA bans contributions made by any "principal" of that entity.[10] *See id.* § 9-612(g)(1)(F), (2)(A)-(B). A "principal" is defined to include, among other things, (1) any member of the entity's board of directors,[11] (2) any "individual" who "has an ownership interest of five per cent or more" in the entity, (3) the "president, treasurer or executive vice president" of the entity,[12] and (4) any "officer" or "employee" of either a business entity or a nonprofit organization who "has managerial or discretionary responsibilities with respect to a state contract."[13]

---

[10] We note that many state contractors are likely artificial entities, so the provisions governing the behavior of "principals" of contractors are particularly important.

[11] Although in most cases, the CFRA applies equally to for-profit and nonprofit organizations, the definition of "principal" does not include "an individual who is a member of the board of directors of a nonprofit organization." Conn. Gen. Stat. § 9-612(g)(1)(F)(i).

[12] If the entity is "not a business entity," the CFRA applies to the "chief executive officer" of the entity or "the officer who duly possesses comparable powers and duties." Conn. Gen. Stat. § 9-612(g)(1)(F)(iii).

[13] "Principal" is also defined to include the "spouse" or "dependent child" of a contractor. *See* Conn. Gen. Stat. § 9-612(g)(1)(F)(v). We discuss that aspect of the definition separately. *See* note 1, *ante.*

19

The definition of "principal" sweeps broadly and prevents a wide range of individuals from contributing to campaigns for state office. We have some doubts, therefore, as to whether the provision is indeed closely drawn to achieve the state's anticorruption interest.

Nonetheless, we are mindful of the teachings of the Supreme Court that we, as judges, cannot consider each possible permutation of a law limiting contributions, and thus we "cannot determine with any degree of exactitude the precise restriction necessary to carry out the statute's legitimate objectives." *Randall*, 548 U.S. at 248. Moreover, in light of the troubling episodes involving state contractors in Connecticut's recent history, we are reluctant to second-guess the judgment of the General Assembly when it defines which individuals associated with an artificial entity are likely to attempt to exert improper influence over a state official.

We will, therefore, follow the "ordinar[y]" approach in evaluating the ban on principal contributions and "defer[] to the legislature's determination of such matters." *Id.* The ban on principals' contributions strikes us as bordering on overboard, but the record shows that the dangers of corruption associated with contractor contributions are so significant in Connecticut that the General Assembly should be afforded leeway in its efforts to curb contractors' influence on state lawmakers.

We thus conclude that, insofar as it applies to campaign contributions made by "principals" of state contractors or prospective state contractors, *see* Conn. Gen. Stat. § 9-612(g)(1)(F), (2)(A)-(B), the CFRA is closely drawn and withstands First Amendment scrutiny.

---

"Principal" is also defined to include "a political committee established or controlled by an individual described in [subparagraph (F)] or the business entity or nonprofit organization that is the state contractor or prospective state contractor." *See* Conn. Gen. Stat. § 9-612(g)(1)(F)(vi).

20

#### d.    Spouses and Children of Contractors

The CFRA not only bans contributions by contractors, prospective contractors, and the principal of any contractor or prospective contractor; it also bans contributions by the "spouse" or "dependent child" of any of those covered individuals. *See* Conn. Gen. Stat. § 9-612(g)(1)(F)(v), (1)(G), (2)(A)-(B). Defendants do not attempt to justify the ban on family-member contributions by arguing that a contractor's family members will themselves attempt to exert improper influence over a state official. *See* Appellees' Br. 80-83, 98. That is for good reason, as there is no record evidence to suggest that the spouses or dependent children of state contractors have been in any way involved in Connecticut's recent corruption scandals (or, for that matter, any other corruption scandals of which the parties have made us aware). Rather, defendants attempt to justify the ban on family-member contributions by arguing that it is a "reasonable measure to avoid circumvention of the prohibition of contributions by [contractors]." *Id.* at 80. That is, defendants argue that contractors and other covered individuals will avoid the CFRA's ban on contractor contributions by siphoning their improper contributions through their spouses and children.

The Supreme Court has recognized that, in regulating campaign contributions, the legislature must be given "room to anticipate and respond to concerns about circumvention of regulations designed to protect the integrity of the political process." *McConnell*, 540 U.S. at 137; *see also Beaumont*, 539 U.S. at 155. Nonetheless, the Court has struck down so-called anti-circumvention provisions where the government has put forward only "scant evidence" of a particular "form of evasion." *McConnell*, 540 U.S. at 232.

Here, the record in support of the ban on contributions by contractors' spouses and dependent children is by no means overwhelming. There is little direct evidence suggesting that contractors will use their spouses or children to circumvent the CFRA's contribution bans.

21

Nevertheless, the recent corruption scandals in Connecticut have shown that contractors are willing to resort to varied forms of misconduct to secure contracts with the state. That, we think, is far more than the "scant evidence" required by *McConnell. See id.*

In light of the recent corruption scandals, therefore, the General Assembly must be given "room to anticipate and respond to concerns about" the "circumvention" of the bans on contractor contributions. *Id.* at 137. Indeed, were we to affirm the ban on contributions by contractors but strike down the ban on contributions by their family members, we would invite the very circumvention that the General Assembly was trying to prevent.

Thus, we conclude that the CFRA's ban on contributions by contractors' spouses and dependent children, *see* Conn. Gen. Stat. § 9-612(g)(1)(F)(v), (1)(G), (2)(A)-(B), is "closely drawn" to avoid the circumvention of the ban on contractor contributions.

### e.    A "Ban" as Opposed to a "Limit"

Finally, we consider the fact that the CFRA imposes an outright ban—not a mere limit—on contributions made by contractors, prospective contractors, and their principals. That fact, as discussed above, does not require us to review the law under the strict scrutiny standard. But we must nevertheless determine whether an outright ban on contractor contributions is closely drawn to the state's anticorruption interest. *See Beaumont*, 539 U.S. at 162 ("It is not that the difference between a ban and a limit is to be ignored; it is just that the time to consider it is when applying scrutiny at the level selected, not in selecting the standard of review itself.").

The majority of campaign laws reviewed by the Supreme Court—and other courts—have involved *limits* on contributions, not bans. *See, e.g., Randall*, 548 U.S. at 246; *Nixon*, 528 U.S. at 381; *Cal. Med. Ass'n v. Fed. Election Comm'n*, 453 U.S. 182, 184 (1981); *Buckley*, 424 U.S. at 13. The Court has, however, upheld the longstanding federal "ban on direct corporate contributions." *Beaumont*,

22

539 U.S. at 154. That is enough to demonstrate that laws banning contributions by a discrete group are not unconstitutional *per se*.

Yet a ban is a drastic measure. A limit on contributions causes some constitutional damage, as it "*restrict[s]* 'one aspect of the contributor's freedom of political association.'" *Randall*, 548 U.S. at 246 (quoting *Buckley*, 424 U.S. at 24-25) (emphasis added). But a ban on contributions causes considerably more constitutional damage, as it wholly *extinguishes* that "aspect of the contributor's freedom of political association." A limit, moreover, leaves intact the contributor's right to make "the symbolic expression of support evidenced by a contribution." *Id.* at 247 (quoting *Buckley*, 424 U.S. at 21). But a ban infringes that constitutional right, as it precludes the "symbolic expression" that comes with a small contribution.

There are, therefore, undoubtedly many situations in which a strict contribution limit—as opposed to an outright contribution ban—will adequately achieve the government's objectives. In those situations it will be difficult for the government to establish that a contribution ban is "closely drawn" to its asserted interests. Instead, such a ban risks being struck down as unconstitutionally overbroad.

Here, for example, a limit—as opposed to a ban—would likely be sufficient to address the General Assembly's interest in addressing *actual* corruption. If, for example, the CFRA were to allow contractors to make small contributions (say, $50 per election) to state officials, it is unlikely that a contractor could exert any influence over an official with the promise of such a modest sum. Yet such a limit would not wholly extinguish a contractor's associational rights, and it would allow the contractor to make "the symbolic expression of support evidenced by a contribution." *Id.* at 247 (quoting *Buckley*, 424 U.S. at 21). Thus, if the state's only interest in this case were combating *actual* corruption, the CFRA's outright ban on contractor contributions would likely be held overbroad.

23

Combating *actual* corruption, however, is not the state's only interest here; the CFRA is also meant to address the *appearance* of corruption caused by contractor contributions. *See Green Party I,* 590 F. Supp. 2d at 303. As discussed above, Connecticut's recent corruption scandals were widely publicized, and corruption involving state contractors became a major political issue in Connecticut in recent years. *See* subsection I.B.2.e, *ante.* A limit on contractor contributions would have partially addressed the perception of corruption created by those incidents, but such a limit still would have allowed some money to flow from contractors to state officials. Even if small contractor contributions would have been unlikely to influence state officials, those contributions could have still given rise to the appearance that contractors are able to exert improper influence on state officials.

The CFRA's *ban* on contractor contributions, by contrast, unequivocally addresses the perception of corruption brought about by Connecticut's recent scandals. By totally shutting off the flow of money from contractors to state officials, it eliminates any notion that contractors can influence state officials by donating to their campaigns. Thus, although the CFRA's ban on contractor contributions is a drastic measure, it is an appropriate response to a specific series of incidents that have created a strong appearance of corruption with respect to all contractor contributions.

We hold, as a result, that in light of Connecticut's recent experience with corruption scandals involving state contractors, the CFRA's imposition of an outright ban on contributions by contractors, prospective contractors, and their principals, *see* Conn. Gen. Stat. § 9-612(g), is closely drawn to the state's interest in combating the appearance of corruption.

**B.  The Ban on Contributions by Lobbyists and Their Families**

The CFRA's ban on contributions by lobbyists presents markedly different considerations than the CFRA's ban on contributions by contractors.  The distinction centers on the fact that the recent corruption scandals in Connecticut in no way involved lobbyists.  *See, e.g.*, *Green Party I*, 590 F. Supp. 2d at 321 ("[L]obbyists ha[ve] not been directly linked to the pay-to-play scandals, which primarily involved *state contractors* offering bribes in exchange for preferential treatment . . . ." (emphasis added)).

As a restriction on campaign contributions, not campaign *expenditures*, we review the CFRA's ban on lobbyists contributions under the closely drawn standard.  *See Beaumont*, 539 U.S. at 162; subsection I.A, *ante*.  We will uphold the ban against plaintiffs' First Amendment challenge only if it is closely drawn to achieve sufficiently important government interests.  *Beaumont*, 539 U.S. at 162.

Defendants seek to justify the ban on lobbyist contributions as necessary to combat both actual corruption and the appearance of corruption.  We decline to decide whether those interests are sufficiently important in this context, *see id.*, for "[e]ven assuming, *arguendo*, the Government advances an important interest," *McConnell*, 540 U.S. at 232, the CFRA's ban on lobbyist contributions is not closely drawn to the asserted interests.

As set forth above, *see* subsection I.B.2.e, *ante*, an outright ban on contributions is a drastic measure that substantially infringes "one aspect of the contributor's freedom of political association."  *Randall*, 548 U.S. at 246 (quoting *Buckley*, 424 U.S. at 24-25).  As opposed to a contribution *limit*, which merely restricts those First Amendment freedoms, *see id.*, a contribution ban utterly eliminates an individual's right to express his or her support for a candidate by contributing money to the candidate's cause.  Indeed, a contribution ban cuts off even the "symbolic expression of support evidenced by" a small contribution.  *Id.* at 247 (quoting *Buckley*, 424 U.S. at 21).  Thus, if

25

the state's interests in this case can be achieved by means of a *limit* on lobbyist contributions, rather than a ban, the ban should be struck down for failing "to avoid unnecessary abridgment of associational freedoms," *Buckley*, 424 U.S. at 25.[14]

We have upheld the CFRA's ban on *contractor* contributions because the recent corruption scandals in Connecticut have created an appearance of corruption with respect to *all* exchanges of money between state contractors and candidates for state office. We have held that an outright ban on contractor contributions was justified (*i.e.*, closely drawn to meet the state's anticorruption interest) because even a severe limit on contractor contributions would allow a small flow of contributions between contractors and candidates and would, as a result, likely give rise to an appearance of corruption.

The situation is different with lobbyists. The recent corruption scandals had nothing to do with lobbyists, *see Green Party I*, 590 F. Supp. 2d at 321, and thus there is insufficient evidence to infer that *all* contributions made by state lobbyists give rise to an appearance of corruption. Plaintiffs have submitted some evidence suggesting that many members of the public generally distrust lobbyists and the "special attention" they are believed to receive from elected officials. *See, e.g.*, Meadow Decl. ¶¶ 13-14, 26. But as the Supreme Court has recently clarified, the anticorruption interest recognized by *Buckley* and other cases is "limited to *quid pro quo* corruption" and does not encompass efforts to limit "[f]avoritism and influence" or the "appearance of influence or access." *Citizens United*, 130 S. Ct. at 909-10 (quotation marks omitted). "The fact that speakers may have influence over or access to elected officials does not mean that these officials are corrupt," and

_____

[14] We reiterate that we are *not* applying strict scrutiny, and thus we acknowledge that the ban on lobbyist contributions need not be narrowly tailored to achieve the state's anticorruption interest. Nonetheless, the ban must be closely drawn to the state's interest, a standard that requires some measure of tailoring. In this context, if a contribution limit would suffice where a ban has been enacted, the ban is not closely drawn to the state's interests.

26

favoritism and influence are "[un]avoidable in representative politics." *Id.* at 910 (quotation marks omitted). Influence and access, moreover, are not sinister in nature. Some influence, such as wise counsel from a trusted advisor—even if that advisor is a lobbyist—can enhance the effectiveness of our representative government.

Accordingly, there is insufficient evidence to demonstrate that all lobbyist contributions give rise to an appearance of corruption, and the evidence demonstrating that lobbyist contributions give rise to an appearance of "influence," *see, e.g.*, Meadow Decl. ¶ 26, has no bearing on whether the CFRA's ban on lobbyist contributions is closely drawn to the state's anticorruption interest. We conclude, as a result, that on this record, a *limit* on lobbyist contributions would adequately address the state's interest in combating corruption and the appearance of corruption on the part of lobbyists.[15] The CFRA's *ban* on lobbyist contributions, therefore, is *not* closely drawn to achieve the state's anticorruption interest. Thus, we hold that the CFRA's ban on lobbyist contributions, Conn. Gen. Stat. § 9-610(g), violates the First Amendment.[16]

## II. The CFRA's Solicitation Bans

As set forth above, the CFRA prohibits contractors and lobbyists from "solicit[ing]" contributions "on behalf of" candidates for state office. *See* Conn. Gen. Stat. §§ 9-610(h), 9-612(g)(2). That prohibition applies to current state contractors, prospective state contractors, and the principals of current and prospective state contractors, as well as to the spouses and dependent children of covered lobbyists and contractors. *See id.* §§ 9-601(24), 9-610(h), 9-612(g)(1)(F), (2).

---

[15] Again we emphasize that the recent corruption scandals in Connecticut in no way implicated lobbyists. *See Green Party I*, 590 F. Supp. 2d at 321.

[16] The CFRA's ban on contributions by a lobbyist's spouse or dependent children, a measure intended to prevent lobbyists from circumventing the contribution ban, is likewise *not* closely drawn to achieve the state's anticorruption interest. On this record, therefore, it too violates the First Amendment.

Unlike laws limiting contributions, which present "marginal speech restrictions" that "lie closer to the edges than to the core of political expression," *Beaumont*, 539 U.S. at 161 (quotation marks omitted), a limit on the solicitation of otherwise permissible contributions prohibits exactly the kind of expressive activity that lies at the First Amendment's "core." That is because the solicitation of contributions involves *speech*—to solicit contributions on behalf of a candidate is to make a statement: "You should support this candidate, not only at the polls but with a financial contribution." Whatever may be said about whether money is speech, *see, e.g.*, *Davis v. Fed. Election Comm'n*, 128 S. Ct. 2759, 2778-79 & n.3 (2008) (Stevens, J., dissenting in part), *speech* is speech, even if it is speech about money, *see, e.g.*, *Bates v. State Bar of Ariz.*, 433 U.S. 350, 363 (1977) ("[O]ur cases long have protected speech even though it is . . . in the form of a solicitation to pay or contribute money . . . ."). Speech "'uttered during a campaign for political office,'" moreover, requires the "'fullest and most urgent application'" of the protections set forth in the First Amendment. *Citizens United*, 130 S. Ct. at 898 (quoting *Eu v. S.F. County Democratic Cent. Comm.*, 489 U.S. 214, 223 (1989)) (quotation marks omitted).

Thus, the CFRA's provisions banning the solicitation of contributions are "[l]aws that burden political speech" and are, as a result, "'subject to strict scrutiny,' which requires the Government to prove that the restriction 'furthers a compelling interest and is narrowly tailored to achieve that interest.'" *Id.* (quoting *Fed. Election Comm'n v. Wis. Right to Life, Inc.*, 551 U.S. 449, 464 (2007) (Opinion of Roberts, C.J.)).[17]

---

[17] We recognize that *McConnell* declined an invitation to apply strict scrutiny to certain provisions of federal law that banned the solicitation of contributions. *See* 540 U.S. at 138-40. As the District Court in this case concisely explained, however, the *McConnell* solicitation provisions largely "barred the solicitation of contributions that the potential donor would have been prohibited from making in the first place." *Green Party I*, 590 F. Supp. 2d at 339 (citing *McConnell*, 540 U.S. at 138). Strict scrutiny certainly does not apply to laws prohibiting the solicitation of *illegal* contributions, just as strict scrutiny does not apply to laws prohibiting the solicitation of other

The state attempts to justify the CFRA's solicitation bans, like the CFRA's contribution bans, as a means to combat corruption and the appearance of corruption. Although the anticorruption interest has been held sufficiently important to justify restrictions on contributions, *see, e.g.*, *McConnell*, 540 U.S. at 143; *Buckley*, 424 U.S. at 25-26, in reviewing limits on campaign expenditures under the strict scrutiny standard, the Supreme Court has consistently held that the anticorruption interest is not a compelling government interest, *see, e.g.*, *Citizens United*, 130 S. Ct. at 908-09 (striking down a restriction on corporate independent expenditures); *Buckley*, 424 U.S. at 45 (striking down a different restriction on independent expenditures).

As we observed above, moreover, "[w]hen *Buckley* identified a sufficiently important governmental interest in preventing corruption or the appearance of corruption, that interest was limited to *quid pro quo* corruption." *Citizens United*, 130 S. Ct. at 909. It is easy to see how a "large contribution[]" can be "given to secure a political *quid pro quo* from current and potential office holders." *Buckley*, 424 U.S. at 26. That is the "hallmark" of corruption: "dollars for political favors." *Fed. Election Comm'n v. Nat'l Conservative Political Action Comm.*, 470 U.S. 480, 497 (1985). It is far more difficult to see how an individual might secure a political favor by *recommending* that *another person*

prohibited activity. *See, e.g.*, *United States v. Williams*, 553 U.S. 285, 297 (2008) ("Offers to engage in illegal transactions are categorically excluded from First Amendment protection.").

Here, however, the CFRA's solicitation bans prohibit contractors and lobbyists from soliciting contributions that are otherwise *legal* for the contributors to make. Such provisions are categorically different from most of the provisions at issue in *McConnell*, a point the state "concede[d]" to the District Court. *See Green Party I*, 590 F. Supp. 2d at 339. Many of the solicitation provisions in *McConnell* took the ordinary step of banning the solicitation of contributions that were already prohibited; thus strict scrutiny was plainly inapplicable. The CFRA, by contrast, takes the extraordinary step of banning the solicitation of contributions that are *not* otherwise prohibited; that is a burden on political speech requiring the application of strict scrutiny.

In any event, to the extent that a few of the provisions in *McConnell* banned the solicitation of otherwise legal contributions, *McConnell* is distinguishable: the extreme breadth of the CFRA's solicitation provisions—unlike the provisions in *McConnell*—justifies the application of strict scrutiny because the CFRA's provisions "burden[] speech in a way that a direct restriction on the contribution itself would not." *McConnell*, 540 U.S. at 139.

29

make a campaign contribution, if for no other reason than that the third person must exercise his own free will to make a contribution.

Nevertheless, the District Court upheld the CFRA's solicitation bans based primarily upon its finding that contractors and lobbyists could exert improper influence over state officials by "bundling campaign contributions" made by their clients or employees. *Green Party I*, 590 F. Supp. 2d at 343 & n.33. The threat posed by "bundling" is that contractors and lobbyists will promise to deliver large numbers of coordinated contributions to a state official in exchange for political favors. A prospective state contractor, for instance, might promise to organize a large fundraising event in exchange for a candidate's assistance in securing a lucrative state contract.

There are good reasons to think that the threat of bundling does not provide a compelling justification for the solicitation bans, especially with regard to lobbyists. But even assuming, without deciding, that the threat of bundling makes the anti-corruption interest compelling in this context, the CFRA's ban on solicitations is by no means narrowly tailored to address that threat.

In order to narrowly tailor a law to address a problem, the "government must curtail speech only to the degree necessary to meet the particular problem at hand," and the government "must avoid infringing on speech that does not pose the danger that has prompted regulation." *Fed. Election Comm'n v. Mass. Citizens for Life, Inc.*, 479 U.S. 238, 265 (1986). The government must prove that there is no "less restrictive alternative" to the law in question, for "[i]f a less restrictive alternative would serve the Government's purpose, the legislature must use that alternative." *United States v. Playboy Entm't Group, Inc.*, 529 U.S. 803, 813 (2000).

Here, the state has not met its burden to show that the CFRA's solicitation ban is narrowly tailored to address the problem posed by "bundling," for the ban prohibits a wide range of activity unrelated to bundling, and there are several less restrictive alternatives that would more directly

30

address the perceived bundling threat. For one thing, the CFRA prohibits small-scale solicitation efforts that could not possibly be deemed "bundling." A state contractor, for instance, is prohibited under the CFRA from advising his mother about whether she should contribute to a particular gubernatorial candidate. A less restrictive alternative to address the problem of bundling would be to ban only large-scale efforts to solicit contributions—for example, a ban on state contractors organizing fundraising events of a certain size.

In addition, the problem with bundling, according to the District Court, is that lobbyists will bundle contributions by their "deep-pocketed clients" and state contractors will bundle contributions from their "many employees and subcontractors." *Green Party I*, 590 F. Supp. 2d at 343. If that is the case, then a less restrictive means to address the bundling problem would be simply to ban lobbyists from soliciting contributions from their clients and contractors from soliciting contributions from their employees and subcontractors. The CFRA, however, bans *all* solicitation efforts by lobbyists and contractors—even those not directed at clients, employees, or subcontractors.

Finally, insofar as the CFRA's solicitation ban was intended to combat corruption and the appearance of corruption caused by "bundling," the state has not adequately explained why it could not simply outlaw *bundling* itself. Indeed, the CFRA currently defines the term "solicit" to include, among other things, "bundling contributions," *see* Conn. Gen. Stat. § 9-601(26), and the SEEC has issued a decision that defines the term "bundling," *see* Green Party I, 590 F. Supp. 2d at 297 (citing SEEC Declaratory Ruling 2006-1, at 4). The problem is that, in addition to banning bundling, the CFRA also bans many other activities that often do not involve bundling. *See* Conn. Gen. Stat. § 9-601(26) (broadly defining "solicit" to include, among other things, "requesting that a contribution be made" and "serving as . . . deputy treasurer" of a "political committee").

31

We are not, of course, called upon here to determine the constitutionality of other, hypothetical laws. Our conclusion is only that less restrictive alternatives exist, and thus the state has not met its burden of showing that the CFRA's solicitation ban is narrowly tailored. We hold, therefore, that on this record, the CFRA's bans on the solicitation of contributions, *see* Conn. Gen. Stat. §§ 9-610(h), 9-612(g)(2), violate the First Amendment.

## III.  Remaining Claims

In addition to their First Amendment claims, plaintiffs have asserted claims under the Equal Protection Clause and the Due Process Clause of the Fourteenth Amendment, as well as under the Connecticut Constitution.

The equal protection and due process claims, asserted only by the Association of Connecticut Lobbyists and Barry Williams, challenge provisions of the CFRA that we have struck down under the First Amendment—namely, the CFRA's ban on lobbyist contributions and the solicitation of contributions by lobbyists. Thus we need not address those claims.

With respect to the claims under the Connecticut Constitution, we agree with the District Court that "there is no indication" in Connecticut case law that the Connecticut Constitution "provide[s] broader protection [than] the [federal constitutional] rights at issue here." *Green Party I*, 590 F. Supp. 2d at 346. Thus, insofar as we have held that certain provisions of the CFRA are consistent with the First Amendment, the Connecticut Constitution provides no additional basis—beyond the First Amendment—for challenging the CFRA. Insofar as we have held that certain provisions of the CFRA violate the First Amendment, it is unnecessary for us to decide—and we expressly decline to decide—whether those provisions also violate the Connecticut Constitution.

32

**IV.     The Severability of the Unconstitutional Provisions and the Appropriate Injunctive Relief**

We have held that two aspects of the CFRA violate the First Amendment: the ban on lobbyist contributions and the ban on the solicitation of contributions.  The question arises, therefore, whether those provisions are severable from the CFRA or whether the entire CFRA must be struck down along with the unconstitutional provisions.  The District Court did not consider the severability issue because it held that each of the challenged provisions was constitutional.

In our first opinion, published today, which addressed plaintiffs' challenge to the CFRA's Citizen Election Program (CEP), we remanded the cause to the District Court to determine in the first instance whether certain unconstitutional provisions of the CEP were severable.  We specifically instructed the District Court to examine the meaning of § 9-717 of the General Statutes of Connecticut in connection with its ruling on the severability issue.[18]

_____

[18] That statute, which was recently amended, now reads in full:

> (a) If, during a period beginning on or after the forty-fifth day prior to any special election scheduled relative to any vacancy in the General Assembly and ending the day after such special election, a court of competent jurisdiction prohibits or limits, or continues to prohibit or limit, the expenditure of funds from the Citizens' Election Fund established in section 9-701 for grants or moneys for candidate committees authorized under sections 9-700 to 9-716, inclusive, for a period of seven days or more, (1) sections 1-100b, 9-700 to 9-716, inclusive, 9-750, 9-751 and 9-760 and section 49 of public act 05-5 of the October 25 special session shall be inoperative and have no effect with respect to any race of such special election that is the subject of such court order until the day after such special election, and (2) (A) the amendments made to the provisions of the sections of the general statutes pursuant to public act 05-5 of the October 25 special session shall be inoperative until the day after such special election with respect to any such race, (B) the provisions of said sections of the general statutes, revision of 1958, revised to December 30, 2006, shall be effective until the day after such special election with respect to any such race, and (C) the provisions of subsections (g) to (j), inclusive, of section 9-612 shall not be implemented until the day after such special election with respect to any such race.

(b) Except as provided for in subsection (a) or (c) of this section, if, on or after April fifteenth of any year in which a state election is scheduled to occur, a court of competent jurisdiction prohibits or limits, or continues to prohibit or limit, the expenditure of funds from the Citizens' Election Fund established in section 9-701 for grants or moneys for candidate committees authorized under sections 9-700 to 9-716, inclusive, for a period of thirty days or more, (1) sections 1-100b, 9-700 to 9-716, inclusive, 9-750, 9-751 and 9-760 and section 49 of public act 05-5 of the October 25 special session shall be inoperative and have no effect with respect to any race that is the subject of such court order until December thirty-first of such year, and (2) (A) the amendments made to the provisions of the sections of the general statutes pursuant to public act 05-5 of the October 25 special session shall be inoperative until December thirty-first of such year, (B) the provisions of said sections of the general statutes, revision of 1958, revised to December 30, 2006, shall be effective until December thirty-first of such year, and (C) the provisions of subsections (g) to (j), inclusive, of section 9-612 shall not be implemented until December thirty-first of such year. If, on the April fifteenth of the second year succeeding such original prohibition or limitation, any such prohibition or limitation is in effect, the provisions of subdivisions (1) and (2) of this section shall be implemented and remain in effect without the time limitation described in said subdivisions (1) and (2).

(c) If, during a year in which a state election is held, on or after the second Tuesday in August set aside as the day for a primary under section 9-423, a court of competent jurisdiction prohibits or limits the expenditure of funds from the Citizens' Election Fund established in section 9-701 for grants or moneys for candidate committees authorized under sections 9-700 to 9-716, inclusive, for a period of fifteen days, or if said Tuesday occurs during a period of fifteen days or more in which period such a court continues to prohibit or limit such expenditures, then, after any such fifteen-day period, (1) sections 1-100b, 9-700 to 9-716, inclusive, 9-750, 9-751 and 9-760 and section 49 of public act 05-5 of the October 25 special session shall be inoperative and have no effect with respect to any race that is the subject of such court order until December thirty-first of such year, and (2) (A) the amendments made to the provisions of the sections of the general statutes pursuant to public act 05-5 of the October 25 special session shall be inoperative until December thirty-first of such year, (B) the provisions of said sections of the general statutes, revision of 1958, revised to December 30, 2006, shall be effective until December thirty-first of such year, and (C) the provisions of subsections (g) to (j), inclusive, of section 9-612 shall not be implemented until December thirty-first of such year. If, on the April fifteenth of the second year succeeding such original prohibition or limitation, any such prohibition or limitation is in effect, the provisions of subdivisions (1) and (2) of this section shall be implemented and remain in

34

We adopt that same approach here and remand to the District Court to determine whether the unconstitutional provisions of the CFRA addressed in this opinion are severable from the remainder of the law. In so doing the District Court should examine the relevancy, if any, of § 9-717. After the District Court has ruled on the severability issue, it should then enter appropriate injunctive relief in light of our holdings in this opinion.

## CONCLUSION

In summary, we hold as follows:

(1) The CFRA's bans on contributions by state contractors, lobbyists, and associated individuals, *see* Conn. Gen. Stat. §§ 9-610(g), 9-612(g)(2)(A)-(B), are "marginal speech restrictions" that withstand scrutiny under the First Amendment if they are "closely drawn to match a sufficiently important [government] interest." *Fed. Election Comm'n v. Beaumont*, 539 U.S. 146, 161-62 (2003) (quotation marks omitted).

(2) The CFRA's ban on *contractor* contributions, *see* Conn. Gen. Stat. § 9-612(g)(2)(A)-(B), is consistent with the First Amendment. The ban furthers "sufficiently important" government interests, *Beaumont*, 539 U.S. at 162 (quotation marks omitted), in that it addresses both the "actuality" and the "appearance" of corruption involving state contractors, *see Buckley v. Valeo*, 424 U.S. 1, 26 (1976). It is also "closely drawn" to achieve those interests. *Beaumont*, 539 U.S. at 162

---

effect without the time limitation described in said subdivisions (1) and (2).

(d) Any candidate who has received any funds pursuant to the provisions of sections 1-100b, 9-700 to 9-716, inclusive, 9-750, 9-751 and 9-760 and section 49 of public act 05-5 of the October 25 special session prior to any such prohibition or limitation taking effect may retain and expend such funds in accordance with said sections unless prohibited from doing so by the court.

Conn. Gen. Stat. § 9-717 (as amended by Public Act 10-2 on April 14, 2010).

(quotation marks omitted). With respect to the ban on contractor contributions, therefore, we affirm the District Court's grant of summary judgment to defendants.

(3) The CFRA's ban on *lobbyist* contributions, Conn. Gen. Stat. § 9-610(g), violates the First Amendment. Although an outright ban on *contractor* contributions can be justified as a means to address the appearance of corruption caused by Connecticut's recent corruption scandals, those scandals did not involve lobbyists and thus do not provide sufficient justification for an outright ban on lobbyist contributions. Rather, even assuming, without deciding, that the state's anticorruption interest is "sufficiently important" in this context, an outright *ban* on lobbyist contributions—as opposed to a mere *limit* on lobbyist contributions—is not closely drawn to achieve the state's interest. *See Beaumont*, 539 U.S. at 162. With respect to the ban on lobbyist contributions, therefore, we reverse the District Court's grant of summary judgment to defendants and instruct the Court to grant summary judgment to plaintiffs.

(4) The CFRA's ban on the solicitation of contributions, *see* Conn. Gen. Stat. §§ 9-610(h), 9-612(g)(2)(A)-(B), is a law that "burden[s] political speech" and is, as a result, subject to strict scrutiny, *Citizens United v. Fed. Election Comm'n*, 130 S. Ct. 876, 898 (2010). The law will be upheld only if the "[state] . . . prove[s] that the restriction furthers a compelling interest and is narrowly tailored to achieve that interest." *Id.* (quotation marks omitted).

(5) Under the strict scrutiny standard, the CFRA's solicitation ban, *see* Conn. Gen. Stat. §§ 9-610(h), 9-612(g)(2)(A)-(B), violates the First Amendment. Even assuming, without deciding, that the state has a "compelling" interest in preventing contractors and lobbyists from "bundling" contributions, the state has failed to establish that the CFRA's solicitation ban is narrowly tailored to meet that interest because the law prohibits numerous activities unrelated to "bundling." With

respect to the solicitation ban, therefore, we reverse the District Court's grant of summary judgment to defendants and instruct the Court to grant summary judgment to plaintiffs.

(6) We need not address plaintiffs' equal protection and due process claims, for they challenge provisions of the CFRA that we have struck down under the First Amendment—namely, the CFRA's ban on lobbyist contributions and the solicitation of contributions by lobbyists.

(7) Insofar as we have upheld certain provisions of the CFRA under the First Amendment, we likewise uphold those provisions under the Connecticut Constitution, which provides no additional basis—beyond the First Amendment—for challenging the provisions in question. Insofar as we have held that certain provisions of the CFRA violate the First Amendment, it is unnecessary for us to decide—and we expressly decline to decide—whether those provisions also violate the Connecticut Constitution.

(8) We remand the cause to the District Court (a) to determine, in the first instance, whether the unconstitutional provisions of the CFRA are severable from the remainder of the statute; (b) to grant appropriate injunctive relief in light of our holdings in this opinion and the District Court's resolution of the severability issue on remand; and (c) to conduct any further proceedings, consistent with this opinion, that may be required.

*       *       *

The February 11, 2009 partial judgment of the District Court on Count Four of this action is **AFFIRMED** in part and **REVERSED** in part as set forth in sections (1) through (7) of this conclusion. The cause is **REMANDED** to the District Court for further proceedings in accordance with the instructions set forth in section (8) of this conclusion.

Recognizing that an election has been scheduled for November 2, 2010, and given the importance of this case to ongoing campaigns for state office, we request that the District Court act expeditiously in considering the issues presented for decision on remand.