# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 10-3126

_____

Minnesota Citizens Concerned for     *
Life, Inc.; The Taxpayers League of     *
Minnesota; Coastal Travel Enterprises,     *
LLC,     *
    *
         Plaintiffs-Appellants,     *
    *    Appeal from the United States
    *    District Court for the
        v.     *    District of Minnesota.
    *
Lori Swanson, Minnesota Attorney     *
General, in her official capacity; Bob     *
Milbert; John Scanlon; Terri Ashmore;     *
Hilda Bettermann; Felicia Boyd; Greg     *
McCullough, Minnesota Campaign     *
Finance and Public Disclosure Board     *
Members, in their official capacities;     *
Raymond Krause, Chief Administrative     *
Law Judge of the Minnesota Office of     *
Administrative Hearings, in his official     *
capacity; Eric Lipman, Assistant Chief     *
Administrative Law Judge of the     *
Minnesota Office of Administrative     *
Hearings, in his official capacity;     *
Manuel Cervantes; Beverly Heydinger;     *
Richard Luis; Steve Mihalchick;     *
Barbara Neilson; Kathleen Sheehy,     *
Administrative Law Judges of the     *
Minnesota Office of Administrative     *
Hearings, in their official capacities;     *

Michael Freeman, Hennepin County    *
Attorney, in his official capacity,    *
   *
        Defendants-Appellees.    *
   *
   *
_____    *
   *
Campaign Legal Center; Democracy    *
21; and The Brennan Center for Justice,   *
NYU School of Law,    *
   *
        Amici on Behalf of Appellee.    *

_____

Submitted: January 11, 2011
Filed: May 16, 2011

_____

Before RILEY, Chief Judge, BYE and MELLOY, Circuit Judges.

_____

MELLOY, Circuit Judge.

Minnesota Citizens Concerned for Life, Inc., The Taxpayers League of Minnesota, and Coastal Travel Enterprises, LLC, (collectively "Minnesota Citizens") are Minnesota corporations challenging several provisions of Minnesota's corporate election laws. Specifically, Minnesota Citizens seeks to invalidate (1) Minnesota's ban on corporations making direct contributions to candidates and political parties and (2) Minnesota's regulation of how corporations may make independent expenditures, as defined in the next section. Minnesota Citizens brings this challenge in response to the Supreme Court's recent decision in Citizens United v. Federal Election Commission, 130 S. Ct. 876 (2010). At the outset of the proceeding below,

Minnesota Citizens moved for a preliminary injunction. The district court[1] denied the motion, and Minnesota Citizens appeals this denial.  We affirm.

I.

The First Amendment provides in part that "Congress shall make no law . . . abridging the freedom of speech."  Interpreting this provision, the Supreme Court in Citizens United overruled its prior precedent and held that the government may not ban corporations from making independent expenditures, that is, "political speech presented to the electorate that is not coordinated with a candidate," advocating the election or defeat of a candidate.  130 S. Ct. at 910, 913.  The Supreme Court further held that the government may not force corporations wishing to make independent expenditures to speak through "separate segregated fund[s]," known as political action committees ("PACs"), at least where the PACs are "separate association[s] from the corporation" and where the PACs are subject to "burdensome" regulations. Id. at 897.  The Supreme Court, however, upheld a federal disclaimer and disclosure law at issue and did not expressly overrule its prior precedent allowing the government to prohibit direct corporate contributions to candidates and other entities, like political parties, that work in conjunction with candidates.  Id. at 886, 917.

In response, Minnesota amended portions of its election laws.  Minnesota retained a longstanding prohibition on direct corporate contributions to candidates and affiliated entities.  Minn. Stat. § 211B.15, subdiv. 2.  At most, according to Minnesota Citizens, Minnesota permits corporations to establish conduit funds to which others may contribute.  See id. subdiv. 16.  In contrast, Minnesota amended its regulations on corporate independent expenditures and created two means by

---

[1]  The Honorable Donovan W. Frank, United States District Judge for the District of Minnesota.

-3-

which corporations could make such expenditures.  Id., subdiv. 3; Minn. Stat. § 10A.12, subdiv. 1a.  Minnesota first defined an independent expenditure as:

> an expenditure expressly advocating the election or defeat of a clearly identified candidate, if the expenditure is made without the express or implied consent, authorization, or cooperation of, and not in concert with or at the request or suggestion of, any candidate or any candidate's principal campaign committee or agent.

Minn Stat. § 10A.01, subdiv. 18.  Minnesota then required corporations wishing to make such expenditures to either "form[] and register[] an independent expenditure political fund if the expenditure is in excess of $100 or [contribute to an] existing independent expenditure political committee or political fund."  Id. § 10A.12, subdiv. 1a; see also Minn. Stat. § 211B.15, subdiv. 3.

If a corporation chooses to establish a political fund, then the corporation and its political fund are subject to a series of statutory requirements.  Under the revised Minnesota law, the corporation must first appoint a treasurer for the political fund, and the treasurer must then register the fund within fourteen days by filling out a two-page form disclosing, among other things, a listing of all of the fund's depositories and the names and addresses of the fund, treasurer, and any deputy treasurers.  Id. §§ 10A.12, subdiv. 3, 10A.14, subdivs. 1, 2.  The political fund must also segregate its funds from any other funds.  Id. § 10A.12, subdiv. 2.  If a corporation is the sole donor to its fund, a corporation can segregate funds with an internal bookkeeping device, such as a spreadsheet.  Once established, the political fund must further file periodic, detailed reports.  As the district court explained:

> The fund must file five reports during a general-election year and one report during a non-general-election year.  Minn. Stat. § 10A.20.  The report must disclose the amount of liquid assets at the beginning of a reporting period; the name and address of each individual or association whose contributions within the year exceed $100; the amount and date

of such contributions; the sum of contributions during the reporting period; each loan made or received that exceeds $100; the name and address of the lender; receipts over $100 during the reporting period not otherwise listed; the sum of those receipts; the name and address of each individual or association to whom the reporting entity made expenditures within the year exceeding $100; the sum of all expenditures made by the reporting entity during the reporting period; the name and address of each political committee, political fund, principal campaign committee, or party unit to which contributions in excess of $100 were made; the sum of all contributions; the amount and nature of any advance of credit incurred; the name and address of each individual or association to whom noncampaign disbursements have been made that aggregate in excess of $100 and the purpose of each noncampaign disbursement; the sum of all noncampaign disbursements; and the name and address of a nonprofit corporation that provides administrative assistance to the political committee or political fund. Minn. Stat. § 10A.20.

Moreover, the treasurer for a political fund must keep certain records and make them available for an audit. Id. § 10A.13. Finally, if a political fund wants to dissolve, then it must settle its debts, dispose of its remaining assets, and file a termination report. Id. § 10A.24. One method in which a political fund can dispose of its assets is by returning contributions to their sources. Id. § 211B.12; § 10A.01, subdiv. 26(2).

If, on the other hand, a corporation chooses to contribute to an existing political fund, then the corporation is subject to fewer statutory requirements. A for-profit corporation need only provide its name and address for contributions made from its general treasury. A non-profit corporation, by contrast, would also need to disclose information regarding the underlying source of the contribution if the corporation contributed more than $5,000 to a political fund or committee. Similarly, a corporation that solicits and receives contributions for a political fund must disclose the source of the contributions.

In this case, appellants are three Minnesota corporations seeking to advance their respective social and commercial interests. Minnesota Citizens Concerned for Life is a non-profit corporation seeking to "secure protections for innocent human life from conception until natural death through effective education, legislation, and political action." The Taxpayer League of Minnesota is a non-profit corporation advocating for "lower taxes, limited government, and full empowerment of taxpaying citizens." Finally, Coastal Travel Enterprises, LLC, is a for-profit, limited-liability corporation that provides "retail travel industry services." Each corporation exists for a purpose other than nominating or electing specific candidates, but each corporation wishes to make independent expenditures and to contribute directly to candidates and political parties.[2] The companies filed suit to enjoin Minnesota elections laws on independent expenditures and corporate contributions to candidates and political parties and moved for a preliminary injunction. The district court denied the motion to enjoin primarily because the corporations failed to show a "likelihood of success." This appeal followed.

II.

Minnesota Citizens argues that the district court erred in failing to grant a preliminary injunction. According to Minnesota Citizens, it is likely to prevail on the merits with respect to the issue of corporate independent expenditures because Minnesota regulates such expenditures in a manner Citizens United prohibits. Minnesota Citizens maintains that Minnesota effectively retained its ban on corporate independent expenditures by requiring corporations to use separate entities—i.e., political funds—to speak and by imposing "burdensome" regulations on political funds similar to those that the Supreme Court found to constitute a de facto ban in

_____

[2] If the "major purpose" of the corporations were to "influence the nomination or election of a candidate or to promote or defeat a ballot question," then Minnesota law would require the corporations to register as political action committees. Minn. Stat. § 10A.01, subdiv. 27.

Citizens United.  Minnesota Citizens also argues that it is likely to prevail on the issue of direct corporate contributions because Citizens United broadly holds that the First Amendment proscribes any governmental ban on corporate political speech. Minnesota Citizens alternatively asserts that prior Supreme Court precedent, when properly interpreted, allows the government to limit direct contributions to candidates and affiliated entities only when corporations have another means of speaking, which Minnesota Citizens does not have because Minnesota functionally banned all forms of direct corporate contributions.  Moreover, Minnesota Citizens claims that Minnesota's disputed election laws are not properly tailored in light of the constitutionally heightened level of scrutiny.  Finally, Minnesota Citizens argues that it satisfied the remaining requirements for issuing an injunction.  We disagree and address each of Minnesota Citizens's arguments in turn.

When evaluating whether to issue a preliminary injunction, a court should consider four factors:  (1) the probability that the movant will succeed on the merits; (2) the threat of irreparable harm to the movant; (3) the state of balance between this harm and the injury that granting the injunction will inflict on other parties; and (4) the public interest.  Dataphase Sys., Inc. v. C L Sys., Inc., 640 F.2d 109, 114 (8th Cir. 1981).  A party seeking to challenge the validity of a duly enacted state statute must meet a more rigorous standard of success, however, and show that it is "likely to prevail on the merits" because of the deference owed to laws which are the product of the democratic process.  Planned Parenthood Minn., N.D., S.D. v. Rounds, 530 F.3d 724, 733 (8th Cir. 2008).  Nevertheless, as to the merits of a specific issue, "the burdens at the preliminary injunction stage track the burdens at trial."  Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal, 546 U.S. 418, 429 (2006). Additionally, a court's determination regarding the ability of a moving party to prevail will often be determinative of the matter, especially in First Amendment cases where a party is seeking to enjoin a law that restricts speech.  Phelps-Roper v. Nixon, 545 F.3d 685, 690 (8th Cir. 2008); see also Planned Parenthood, 530 F.3d at 732 ("If the party with the burden of proof makes a threshold showing that it is likely to prevail

on the merits, the district court should then proceed to weigh the other <u>Dataphase</u> factors."). Finally, we review the denial of a preliminary injunction for an abuse of discretion, which may occur when "the district court rests its conclusion on clearly erroneous factual findings or erroneous legal conclusions." <u>Planned Parenthood</u>, 530 F.3d at 733 (internal quotation marks omitted).

## A.

Minnesota Citizens first argues that Minnesota impermissibly preserved its ban on corporate independent expenditures when amending its election laws. Minnesota Citizens asserts that Minnesota still bans corporations from making independent expenditures because corporations can only contribute to political funds, which are separate entities. This runs afoul of the Supreme Court's "clear" holding in <u>Citizens United</u>, which, according to Minnesota Citizens, mandates that "corporations must be allowed to make their own, general-fund independent expenditures." Minnesota Citizens alternatively argues Minnesota's extensive regulation of political funds serves as a de facto ban even if a corporation could theoretically speak through a political fund. For support, Minnesota Citizens argues the regulations Minnesota imposes are materially indistinguishable from the PAC regulations the Supreme Court found to be unconstitutionally burdensome in <u>Citizens United</u>. Minnesota Citizens specifically takes issue with Minnesota's requirement of periodic reports, segregated funds, and the appointment of a treasurer. We disagree, finding that Minnesota's provisions on corporate independent expenditures are similar in purpose and effect to the disclosure laws that the Supreme Court upheld in <u>Citizens United</u>.

To address Minnesota Citizen's arguments, we first turn to the Supreme Court's decision in <u>Citizens United</u>. In <u>Citizens United</u>, the Supreme Court considered the constitutionality of a federal law that prohibited "corporations and unions from using their general treasury funds to make independent expenditures for speech defined as

an 'electioneering communication' or for speech expressly advocating the election or defeat of a candidate."[3] 130 S. Ct. at 886 (quoting 2 U.S.C. § 441b). Related provisions of federal law, though, permitted corporations and unions to establish and administer "separate segregated fund[s] (known as . . . political action committee[s], or PAC[s]) for these purposes," but limited "moneys received by the segregated fund[s] . . . to donations from stockholders and employees of the corporation[s] or, in the case of unions, members of the union[s]." Id. at 887–88 (citation omitted) (internal quotation marks omitted). The Court further considered the constitutionality of a federal disclaimer law and a federal disclosure law. The disclosure law is most relevant and mandated in part that:

> any person who spends more than $10,000 on electioneering communications within a calendar year must file a disclosure statement with the [Federal Election Commission]. That statement must identify the person making the expenditure, the amount of the expenditure, the election to which the communication was directed, and the names of certain contributors.

Id. at 914 (citing 2 U.S.C. § 424(f)). Finally, the Supreme Court considered these laws in the context of a non-profit corporation that wished to release a film critical of then-Senator Hillary Clinton, who was a candidate for the 2008 Democratic presidential primary, and wished to do so without complying with the applicable federal disclaimer or disclosure laws. Id. at 887, 913.

In resolving the case, the Supreme Court struck down § 441b's restrictions on corporate independent expenditures but upheld the federal disclaimer and disclosure

---

[3]Federal law defines an electioneering communication as any publicly available "broadcast, cable, or satellite communication that refers to a clearly identified candidate for Federal office and is made within 30 days of a primary or 60 days of a general election." Citizens United, 130 S. Ct. at 887 (internal quotation marks omitted).

laws, stating: "The Government may regulate corporate political speech through disclaimer and disclosure requirements, but it may not suppress that speech altogether." Id. at 886. More specifically, the Court held that corporations have a First Amendment right to make independent expenditures; any governmental ban on corporate independent expenditures will trigger the highest level of constitutional scrutiny, namely "strict scrutiny"; and "[n]o sufficient governmental interest" exists to justify a ban under this constitutionally heightened level of scrutiny. Id. at 897–913. The Court then proceeded to strike down § 441b as an impermissible ban on independent expenditures by corporations, despite the ability of corporations to form PACs under § 441b. Id. This is because such PACs are separate entities from their founding corporations and burdensome to administer, both of which effectively prevent corporations from speaking. Id. at 914. As the Court explained:

Section 441b is a ban on corporate speech notwithstanding the fact that a PAC created by a corporation can still speak. A PAC is a separate association from the corporation. So the PAC exemption from § 441b's expenditure ban, § 441b(b)(2), does not allow corporations to speak. Even if a PAC could somehow allow a corporation to speak—and it does not—the option to form PACs does not alleviate the First Amendment problems with § 441b. PACs are burdensome alternatives; they are expensive to administer and subject to extensive regulations. For example, every PAC must appoint a treasurer, forward donations to the treasurer promptly, keep detailed records of the identities of the persons making donations, preserve receipts for three years, and file an organization statement and report changes to this information within 10 days.

And that is just the beginning. PACs must file detailed monthly reports with the FEC, which are due at different times depending on the type of election that is about to occur: These reports must contain information regarding the amount of cash on hand; the total amount of receipts, detailed by 10 different categories; the identification of each political committee and candidate's authorized or affiliated committee making contributions, and any persons making loans, providing rebates, refunds,

dividends, or interest or any other offset to operating expenditures in an aggregate amount over $200; the total amount of all disbursements, detailed by 12 different categories; the names of all authorized or affiliated committees to whom expenditures aggregating over $200 have been made; persons to whom loan repayments or refunds have been made; the total sum of all contributions, operating expenses, outstanding debts and obligations, and the settlement terms of the retirement of any debt or obligation.

Id. at 897 (citations omitted) (internal quotations marks omitted). The Supreme Court also expressly overruled its prior decisions to the contrary, namely portions of Austin v. Michigan Chamber of Commerce, 494 U.S. 652 (1990), and McConnell v. Federal Election Commission, 540 U.S. 93 (2003). Id. at 913. By contrast, the Court upheld the federal disclaimer and disclosure laws at issue under the "exacting scrutiny" standard of review in part because while such "requirements may burden the ability to speak, . . . they impose no ceiling on campaign-related activities and do not prevent anyone from speaking." Id. at 914 (citation omitted) (internal quotation marks omitted).

In this case, we do not believe Minnesota Citizens is likely to prevail on the specific issue of whether Minnesota impermissibly retained a ban on corporate independent expenditures. Under Minnesota law, a corporation does not need to be a separate association from a political fund it establishes. A corporation can retain full control over the operations of a political fund it creates, including by appointing a corporate employee or officer as the fund's treasurer and by directing the political fund to return any excess contributions and dissolve. Additionally, unlike the PACs the Supreme Court considered, a corporation can contribute an unlimited amount directly to its political fund, and the political fund can use these contributions to make expenditures. Citizens United, 130 S. Ct. at 887–88 (citing 2 U.S.C. § 441b(b)(2)). Moreover, a corporation can use a bookkeeping device as simple as an internal spreadsheet to separate a political fund's assets from general corporate assets. Thus,

-11-

while a corporation can choose to create a political fund that may constitute a separate association, a corporation need not do so in order to speak. As such, we conclude Minnesota Citizens is not likely to show that Minnesota retained a per se ban on corporate independent expenditures.

Likewise, Minnesota Citizens is not likely to prevail on its theory that Minnesota retained a functional ban on corporate independent expenditures. The Supreme Court held that PACs are "burdensome alternatives," noting PACs: (1) must appoint a treasurer and forward donations to the treasurer; (2) keep detailed records and receipts for an extended period of time, including information on the identity of donors; (3) file and update an organizational statement; and (4) file monthly reports, detailing the PACs operating expenses, receipts, assets, contributions, expenditures, and debt amongst other things. Citizens United, 130 S. Ct. at 897. The Supreme Court, however, based its holding on the cumulative effects of the federal regulations and not the existence of any specific regulation. See id. ("PACs are burdensome alternatives; they are *expensive* to administer and subject to *extensive* regulations." (emphasis added)). Indeed, the Supreme Court upheld a federal disclaimer law that required detailed disclosures and extensive recordkeeping. Id. at 914. The federal disclosure law at issue required anyone who spent more than $10,000 on electioneering communications within a calendar year to file a report indicating: (1) the identity of the individual or entity making the expenditure; (2) the "custodian of the books and accounts of the person making the disbursement"; (3) "[t]he amount of each disbursement of more than $200 during the period covered by the statement and the identification of the person to whom the disbursement was made"; (4) "[t]he elections to which the electioneering communications pertain and the names (if known) of the candidates identified or to be identified"; and (5) the names and address of anyone who contributed $1,000 or more to the person or entity that paid for the electioneering communication. 2 U.S.C. § 434(f). Consequently, we must evaluate Minnesota's provisions on independent expenditures as a whole.

Collectively, Minnesota's provisions on corporate independent expenditures are significantly less burdensome than the federal regulations on PACs. As stated earlier, a corporation can appoint an employee or officer as treasurer of its political fund and can use simple, internal bookkeeping devices to separate and track contributions and expenditures, which significantly limits the cost of complying with Minnesota's regulations. Moreover, a corporation can easily create and dissolve a political fund, thereby allowing a corporation to limit its exposure to Minnesota's regulations only to the time period it is actively engaging in political speech. Minn. Stat. §§ 10A.14, 10A.24. Additionally, Minnesota places fewer reporting requirements on political funds, as political funds do not have to file reports as frequently as federal PACs and do not have to provide the same level of detail.[4] Indeed, in a political fund's simplest form, where a corporation is controlling the fund's activities, using an employee as a treasurer, and using an internal bookkeeping

---

[4]Minnesota Citizens and the dissent single out Minnesota's periodic reporting requirement as definitive proof of an impermissible burden on corporate independent expenditures. They argue that requiring corporations to file periodic reports—even if the corporations did not make any expenditures during a reporting period—creates a PAC-like burden that effectively bans corporate speech, or at least chills it. We disagree. In Buckley v. Valeo, the Supreme Court approved a periodic reporting requirement for entities other than PACs or candidates, necessarily holding that such requirements are not *per se* invalid. 424 U.S. 1, 80–81, 160 (1976) (upholding a law that provides: "Every person (other than a political committee or candidate) who makes contributions or expenditures, other than by contribution to a political committee or candidate, in an aggregate amount in excess of $100 within a calendar year shall file with the Commission [statements] on the dates on which reports by political committees are filed"); Human Life of Wash. Inc. v. Brumsickle, 624 F.3d 990, 1012–14 (9th Cir. 2010) (upholding a state law mandating periodic reporting). Indeed, we must consider the impact of a reporting requirement as a necessary step in discerning its validity. Here, where the evidence before the district court indicates that corporations can easily file short statements to create and dissolve political funds, we can discern no constitutional infirmity. The burden on corporations appears light, and the reporting requirement greatly facilitates the government's informational interest in monitoring corporate independent expenditures.

device, Minnesota's law imposes no materially greater burden than the federal disclosure law upheld in Citizens United. The treasurer in such cases acts as little more than the custodian of the records, and the information to be disclosed about the corporation's contributions and expenditures is similar to the disclosure requirements upheld in Citizens United. See 2 U.S.C. § 434(f)(2). Consequently, while Minnesota's provisions on corporate independent expenditures do bear some resemblance to federal PACs, the Minnesota provisions place a much more limited burden on corporations. Accordingly, Minnesota Citizens is unlikely to prevail on the issue of whether Minnesota functionally retained a ban on corporate independent expenditures.

B.

Minnesota Citizens further argues that Minnesota's laws governing corporate independent expenditures are not sufficiently tailored given the heightened level of constitutional scrutiny. Continuing from its previous argument, Minnesota Citizens asserts that strict scrutiny, "which requires the Government to prove that the restriction furthers a compelling interest and is narrowly tailored to achieve that interest," should apply because Minnesota banned corporate political expenditures. 130 S. Ct. at 898 (internal quotation marks omitted). Minnesota Citizens maintains that the government does not possess any compelling interest in banning such expenditures for the reasons stated by the Supreme Court in Citizens United. Minnesota Citizens also argues that even if Minnesota possessed a significant governmental interest, Minnesota's requirements, including its requirements of appointing a treasurer and filing periodic reports, are not narrowly tailored. Alternatively, Minnesota Citizens argues that Minnesota's regulations fail under any standard of review, claiming in part that, if a political fund is not a separate

-14-

association from its founding corporation, then the government cannot justify forcing corporations to incur the cost associated with utilizing a political fund.[5] We disagree.

Unlike outright bans on corporate independent expenditures, which are viewed with great suspicion and subjected to strict scrutiny, courts generally view corporate disclosure laws as beneficial and subject such regulations to the less-rigorous exacting-scrutiny standard. Citizens United, 130 S. Ct. at 914. This is because disclosure laws do not materially prevent anyone from speaking and because:

> prompt disclosure of expenditures can provide shareholders and citizens with the information needed to hold corporations and elected officials accountable for their positions and supporters. Shareholders can determine whether their corporation's political speech advances the corporation's interest in making profits, and citizens can see whether elected officials are in the pocket of so-called moneyed interests.

Id. at 916 (internal quotation marks omitted); see also Buckley, 424 U.S. at 66–68 ("The governmental interests sought to be vindicated by the disclosure requirements . . . fall into three categories. First, disclosure provides the electorate with information as to where political campaign money comes from and how it is spent by the candidate in order to aid the voters in evaluating those who seek federal office. . . . Second, disclosure requirements deter actual corruption and avoid the appearance of corruption by exposing large contributions and expenditures to the light of publicity. . . . Third, and not least significant, recordkeeping, reporting, and disclosure requirements are an essential means of gathering the data necessary to detect violations of the contribution limitations described above." (internal quotation marks

---

[5]Minnesota Citizens further contends that only organizations whose "major purpose" is to nominate or elect candidates can be subject to "PAC-style burdens," citing Buckley, 424 U.S. at 79. We see no need to address this argument because we have already concluded that Minnesota did not impose "burdensome" PAC regulations on corporations making independent expenditures.

omitted)).  Consequently, under exacting scrutiny, the government must only show a "'substantial relation' between the disclosure requirement" and the government's important interest in providing information to the electorate.  Citizens United, 130 S. Ct. at 914 (quoting Buckley, 424 U.S. at 64).  "To withstand this scrutiny, the strength of the governmental interest must reflect the seriousness of the actual burden on First Amendment rights."  John Doe No. 1 v. Reed, 130 S. Ct. 2811, 2814 (2010) (internal quotation marks omitted).

As we concluded in the preceding section, Minnesota did not ban corporate independent expenditures.  Instead, based upon the lower court's findings, as strongly supported by the record, we find that Minnesota created a statutory scheme designed to require corporations to disclose certain information when making independent expenditures.  Since the provisions at issue are disclosure laws, we apply exacting scrutiny, just as the Supreme Court did in Citizens United, and review Minnesota's provisions on corporate independent expenditures to ensure that the regulations are substantially related to Minnesota's important interest in providing information.  130 S. Ct. at 915–16.  Based upon the record before the district court, Minnesota appears to have adequately tailored its laws because, as we found in the previous section, Minnesota's provisions collectively impose no materially greater burden on corporations than the disclosure laws at issue in Citizen United.  Even Minnesota's specific requirements for a treasurer, periodic reporting, and a separate fund are sufficiently tailored because, within the context of the entire Minnesota regulatory scheme, each requirement greatly enhances the transparency of corporate expenditures while imposing only reasonable burdens.  See Buckley, 424 U.S. at 80 (holding that a periodic reporting statute that applied to entities other than political committees or candidates because the requirement bore "a sufficient relationship to a substantial governmental interest"); Nat'l Right to Life Political Action Comm. v. Connor, 323 F.3d 684, 695 (8th Cir. 2003) (holding that a treasurer requirement preserved "the integrity of the electoral process" through providing "an individual who is accountable for compliance with the provisions of the disclosure law and can

be easily reached by judicial process" (internal quotation marks omitted)). Accordingly, while we do not deny there are administrative costs to Minnesota's disclosure law on corporate independent expenditures, we conclude that, based upon the record before the district court, Minnesota Citizens is unlike to prevail on its claim of improper tailoring.

C.

Minnesota Citizens also challenges Minnesota's decision to retain its ban on direct corporate contributions to candidates and affiliated entities, such as political parties. Minnesota Citizens argues that any ban on direct corporate contributions violates the First Amendment pursuant to the Supreme Court's holding in Citizens United that the government may not suppress political speech by corporations. Minnesota Citizens further maintains that the Court's holding and reasoning in Citizens United implicitly overruled its prior decision to the contrary on corporate contributions in Federal Election Commission v. Beaumont, 539 U.S. 146 (2003).

Alternatively, Minnesota Citizens argues that Beaumont only permitted the government to restrict corporate contributions when corporations possessed another means of speaking, which in Beaumont, was through establishing PACs. Since Citizens United held that such PACs do not permit corporation to speak, Minnesota Citizens asserts that even if Beaumont remains controlling, Minnesota's ban on direct corporate contributions is impermissible because corporations have no other means of speaking, as corporations can only establish PAC-like conduit funds. Finally, Minnesota Citizens argues that even if Minnesota possesses an interest in restricting

direct corporate contributions, Minnesota failed to adequately tailor its prohibition, given that strict scrutiny would apply to this ban on political speech.[6] We disagree.

"At least since the latter part of the 19th century, the laws of some States and of the United States imposed a ban on corporate direct contributions to candidates." Citizens United, 130 S. Ct. at 900. In Buckley, the Supreme Court "explained that the potential for *quid pro quo* corruption distinguished direct contributions to candidates from independent expenditures" and justified greater governmental restrictions on contributions. Id. at 901–02. Later, in Beaumont, the Supreme Court held that the government could prohibit even non-profit, advocacy corporations from making direct contributions not only because of the danger of quid pro quo corruption stemming from the potential to turn corporate earnings into political "war chests" but also because of the need to protect minority shareholders in corporations and the need to hedge against corporations being used as conduits for circumventing otherwise constitutional, individual contribution limits. See 539 U.S. at 154–55 (stating, in part: "Quite aside from war-chest corruption and the interests of contributors and owners, however, another reason for regulating corporate electoral involvement has emerged with restrictions on individual contributions, and recent cases have recognized that restricting contributions by various organizations hedges against their use as conduits for circumvention of valid contribution limits." (alterations omitted)

[6]Minnesota Citizens also argues that Minnesota's ban on direct corporate contributions violates the Equal Protection Clause of the Fourteenth Amendment because no legitimate governmental interest exists to justify imposing more stringent regulations on corporations than unions and other similar associations, especially since the Supreme Court's decision to the contrary in Austin was overruled by Citizens United. We disagree because the Supreme Court in Austin held that "crucial differences" existed between the structure and functioning of corporation and unions that justified differential treatment under election laws, 494 U.S. at 665–68, and because the Supreme Court in Citizens United did not consider this issue, and thus, did not overrule this portion of Austin. See Citizens United, 130 S. Ct. at 913; but see Dallman v. Ritter, 225 P.3d 610, 634–35 (Col. 2010).

-18-

(internal quotation marks omitted)). While the federal laws at issue allowed corporations to create PACs under §441b for political activity, the Supreme Court's decision did not hinge on the ability of corporations to speak through PACs.[7] See id. at 156–61; Green Party of Conn. v. Garfield, 616 F.3d 189, 204–05 (2d Cir. 2010) (concluding that "laws banning contributions by a discrete group" may be constitutional); Iowa Right To Life Comm., Inc. v. Smithson, ___ F. Supp. 2d ___, 2010 WL 4277715, at *25 n.20 (S.D. Iowa Oct. 20, 2010) (noting that "the result in Beaumont did not depend on the availability of a PAC option" but rather "on the differences between independent expenditures and contributions"). Instead, the Court considered the ability of corporations to establish PACs as an additional factor in favor of upholding the federal laws at issue under the "closely drawn" scrutiny standard the Court applied. Beaumont, 539 U.S. at 162–63.

While the Supreme Court's decision in Citizens United implicates the holding and rationale in Beaumont, we do not believe the Court overruled Beaumont. As an initial matter, the Supreme Court in Citizens United expressly declined to reconsider its jurisprudence on direct corporate contributions, stating in part: "Citizens United has not made direct contributions to candidates, and it has not suggested that the Court should reconsider whether contribution limits should be subjected to rigorous First Amendment scrutiny." 130 S. Ct. at 909. Additionally, the Supreme Court's rationale in Citizens United did not fully undercut the Court's reasoning in Beaumont. Prior to Citizens United, in Austin, the Supreme Court upheld a federal restriction on corporate independent expenditures because the Court found that the government possessed a compelling governmental interest in preventing "the corrosive and distorting effects of immense aggregations of wealth that are accumulated with the help of the corporate form and that have little or no correlation to the public's support

---

[7] Indeed, "[a] ban on direct corporate contributions leaves individual members of corporations free to make their own contributions, and deprives the public of little or no material information." Beaumont, 539 U.S. at 162 n.8.

-19-

for the corporation's political ideas." Austin, 494 U.S. at 660. In Citizens United, the Supreme Court rejected this anti-distortion rationale and overruled Austin in part because the government lacks a sufficient interest in "equalizing the relative ability of individuals and groups to influence the outcome of elections." 130 S. Ct. at 904 (internal quotation marks omitted). The Supreme Court in Citizens United went further, however, and rejected the federal ban on corporate independent expenditures because independent expenditures do not materially involve the government's interest in preventing quid pro quo corruption, as independent expenditures are not coordinated with candidates, and because any governmental interest in protecting dissenting shareholders in corporations could be protected by less-restrictive means. Id. at 908–12. In deciding the case, the Supreme Court in Citizens United never doubted the government's strong interest in preventing quid pro quo corruption or materially questioned the ability of corporations to serve as conduits for circumventing valid contributions limits. See id. Thus, Beaumont remains controlling. See Green Party, 616 F.3d at 199 (concluding that Beaumont is "good law").

Moreover, even assuming that the Supreme Court *implicitly* overruled portions of Beaumont in Citizens United, we must still follow Beaumont until the Supreme Court holds to the contrary. See Agostini v. Felton, 521 U.S. 203, 237 (1997) ("We do not acknowledge, and we do not hold, that other courts should conclude our more recent cases have, by implication, overruled an earlier precedent. We reaffirm that if a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions." (internal quotation marks and alteration omitted)).

Having concluded that Beaumont remains controlling precedent, we find that Minnesota Citizens is unlikely to prevail on its challenge to Minnesota's ban on direct corporate contributions. As the Supreme Court held in Beaumont, a restriction on

direct contributions will pass constitutional muster if the limit is "closely drawn to match a sufficiently important interest."[8] Beaumont, 539 U.S. at 162 (internal quotation marks omitted). This holds true even if the law under review bans all corporate contributions because the "degree of scrutiny turns on the nature of the activity regulated," not the extent of the regulation. Id. Indeed, "[i]t is not that the difference between a ban and a limit is to be ignored; it is just that the time to consider it is when applying scrutiny at the level selected, not in selecting the standard of review itself." Id. In this case, Minnesota possesses the same important governmental interest in avoiding quid pro quo corruption and the circumvention of its other limits on direct contributions as the federal government did in Beaumont. Additionally, based upon the record before the district court, Minnesota appears to have properly tailored its restriction because, pursuant to Beaumont, Minnesota can generally ban all direct corporate contributions.[9] Accordingly, since Minnesota

_____

[8]Minnesota Citizens additionally argues that, regardless of Beaumont's holding, strict scrutiny should apply because Minnesota's ban on direct corporate contributions is a content-based restriction, as Minnesota singles out political speech for further regulation. For support, Minnesota Citizens cites Iowa Right to Life Comm., Inc. v. Williams, 187 F.3d 963 (8th Cir.1999). We disagree because, based upon the record before the district court, Minnesota's ban on direct corporate contributions serves a purpose unrelated to the expressive content of the contributions, namely the prevention of corruption and the circumvention of other election laws. See Fraternal Order of Police, N.D. State Lodge v. Stenehjem, 431 F.3d 591, 596 (8th Cir. 2005) ("A regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others." (internal quotation marks omitted)). Minnesota Citizens's reliance on Williams is misplaced because, in Williams, we found that the challenged law distinguished disfavored speech on the basis of its content, unlike here. 187 F.3d at 967–68. Additionally, we are not at liberty to disregard the Supreme Court's decision to apply "close scrutiny," not strict scrutiny, to bans on direct corporate contributions.

[9]Minnesota Citizens does not meaningfully argue, and the record before the district court does not show, that Minnesota's ban on direct corporate contributions is interfering with the ability of candidates to mount effective campaigns. See

-21-

Citizens cannot show that it is likely to prevail on the direct-contribution issue or the independent-expenditure issue, we find it unnecessary to consider the remaining Dataphase factors and find that the district court did not abuse its discretion in refusing to enjoin Minnesota's election laws.

III.

For the foregoing reasons, we affirm the district court's denial of Minnesota Citizens's request for an injunction.

---

Randall v. Sorrell, 548 U.S. 230, 248–63 (2006) (striking down a contribution limit as too low because the limits prevented candidates from "amassing the resources necessary for effective advocacy" (internal quotation marks omitted)).

RILEY, Chief Judge, concurring in part and dissenting in part.

Because I believe Minnesota's independent expenditure law impermissibly burdens political speech, I respectfully dissent from Part II.B. of the majority opinion.

## Part II.B.

Under Minnesota's relatively complex web of regulations, corporations[10] wishing to make an independent expenditure must comply with burdensome record-keeping and reporting requirements associated with creating and maintaining a political fund. See ante at 3-5 (describing relevant portions of the challenged law). Corporations and responsible individuals failing to comply with Minnesota's regulatory scheme are subject to substantial civil and criminal penalties, ranging from fines to imprisonment of up to five years. See Minn. Stat. §§ 10A.12, subdivs.1b and 6; 10A.121, subdiv. 2; 10A.13, subdiv. 1; 10A.14, subdiv. 4; 10A.15, subdiv. 4; 10A.16; 10A.17, subdiv. 5; 10A.20, subdiv. 12; 211B.15, subdivs. 6-7. The provisions manifestly discourage corporations, particularly corporations with limited resources, from engaging in protected political speech, and hinder their participation in the political debate and their access to the citizenry and the government. See Citizens United v. Fed. Election Comm'n, __ U.S. __,130 S. Ct. 876, 907-08 (2010).

---

[10]The restrictions at issue are much broader than just regulating corporations and indeed affect nearly all associations. Not only does Minnesota's Fair Campaign Practices Act expressly treat limited liability companies the same as corporations, see Minn. Stat. § 211B.15, the requirement that only permits political funds (or political committees) to make independent expenditures is even broader, reaching almost every "association." See § 10A.12, subdiv. 1a. Even the smallest partnership is regulated. See § 10A.01, subdiv. 6 ("'Association' means a group of two or more persons, who are not all members of an immediate family, acting in concert." )

Perhaps most onerous is the ongoing reporting requirement. Once initiated, the requirement is potentially perpetual[11] regardless of whether the corporation ever again makes an independent expenditure. See §10A.20, subdivs. 2 and 7 (requiring political funds to file five reports during a general election year and one report during a non-general election year, even if the political fund has been inactive during that period). The majority draws comfort from the fact Minnesota allows corporations to mitigate this burden by "easily creat[ing] and dissolv[ing] a political fund." Ante at 12. The trouble with this solution is the corporation's constitutional right to speak through independent expenditures dissolves with the political fund. To speak again, the corporation must initiate the bureaucratic process again.

In Citizens United, the Supreme Court instructed, "the Government may not suppress political speech on the basis of the speaker's corporate identity. No sufficient governmental interest justifies limits on the political speech of . . . corporations." Citizens United, 130 S. Ct. at 913. Because political "[s]peech is an essential mechanism of democracy," "the means to hold officials accountable to the people," "a precondition to enlightened self-government and a necessary means to protect it," "political speech must prevail against laws that would suppress it, whether by design or inadvertence." Id. at 898. Therefore, "[l]aws that burden political speech are 'subject to strict scrutiny,' which requires the Government to prove that the restriction 'furthers a compelling interest and is narrowly tailored to achieve that

[11]Minnesota's Campaign Finance and Public Disclosure Board (Board) may, with notice, force dissolution of an "inactive" political fund if "two years have elapsed since the end of a reporting period during which the political . . . fund made an expenditure or disbursement requiring disclosure under [the Campaign Finance and Public Disclosure Act]." § 10A.242, subdivs. 1-2. Until the Board provides such notice, a corporation presumably must continue to file reports on its inactive political fund. The statute is unclear as to what mechanism triggers the process of dissolving inactive political funds. Regardless, a corporation wishing to retain its First Amendment right to make independent expenditures must continue reporting on an ongoing basis.

interest.'" Id. (quoting Fed. Election Comm'n v. Wis. Right to Life, Inc., 551 U.S. 449, 464 (2007) (plurality opinion of Roberts, C.J.)).

Independent expenditures are indisputably political speech. See Buckley v. Valeo, 424 U.S. 1, 39 (1976) (explaining independent expenditures constitute expression "at the core of our electoral process and of the First Amendment freedoms.") (quoting Williams v. Rhodes, 393 U.S. 23, 32 (1968) (internal quotation marks omitted)); Iowa Right to Life Comm., Inc. v. Williams, 187 F.3d 963, 967 (8th Cir. 1999) (recognizing communication "through independent expenditures, as 'core' First Amendment activity"). Under Minnesota's scheme, a corporation is compelled to decide whether exercising its constitutional right is worth the time and expense of entering a long-term or even perpetual morass of regulatory red tape. Some corporations will decide the exercise is simply not worth the trouble. Because the burdens associated with Minnesota's independent expenditure law chill corporate political speech, I would subject the challenged provisions to strict scrutiny analysis. It is unlikely Minnesota would be able to prove aspects of the law, particularly the ongoing reporting requirements, are the least restrictive means of accomplishing a compelling interest.

Despite recognizing the challenged law burdens corporate political speech, see ante at 13, the majority forgoes strict scrutiny analysis, opting instead for "exacting scrutiny" because the majority classifies the provisions as disclosure laws "designed to require corporations to disclose certain information when making independent expenditures," ante at 15. According to the majority, Minnesota's laws "are similar in purpose and effect to the disclosure laws that the Supreme Court upheld in Citizens United." Ante at 8. I disagree with this classification because certain requirements Minnesota imposes on corporations have nothing or very little to do with disclosure.

The federal law challenged in Citizens United, 130 S. Ct. at 913-16 (analyzing 2 U.S.C. §§ 441d(d)(2), 434(f)(1)), required filing a disclosure report only when a

corporation (or anyone else) spent more than $10,000 on electioneering communications (e.g., a television commercial) during any calendar year. See § 434(f). Then, when a communication disclosed "____ is responsible for the content of this advertising," as required by § 441d(d)(2), a citizen could identify the responsible party in public records and discover relevant information. See Citizens United, 130 S. Ct. at 916. This event-driven reporting requirement ended as soon as the report was filed. See § 434(f). The effect of the law—requiring one-time disclosure only when a substantial amount of money was spent—logically matched the government's disclosure purpose. In contrast, the effect of Minnesota's ongoing reporting requirement, which is initiated upon a $100 aggregate expenditure, and is untethered from continued speech, does not match any disclosure interest. Other requirements, such as requiring a treasurer, segregated funds, and record-keeping, also are only tangentially related to disclosure.

The majority explains that "[i]n Buckley v. Valeo the Supreme Court approved a periodic reporting requirement for entities other than PACs or candidates, necessarily holding that such requirements are not *per se* invalid. 424 U.S. 1, 80-81, 160 (1976)." Ante at 13, n.4 (discussing Buckley's analysis of 2 U.S.C. § 434(e) (1970 ed., Supp. IV), Pub. L. No. 92-225 § 305, 86 Stat. 3 (current version at 2 U.S.C. § 434(c)). But the Court in Buckley was not addressing the periodic nature of the requirements. Instead, the Court was construing the meaning of the word "expenditure" in the statute to ensure it "precisely further[ed]" the government's goal "to promote full disclosure of campaign-orientated spending," id. at 78, and did not violate constitutional due process rights because of vagueness concerns, see id. at 76. Regardless, the law at issue in Buckley only required periodic reporting, which at most would require filing statements through the end of the calender year in which a qualifying independent expenditure was made. See § 434(e). The concern here is not that Minnesota's reporting requirement is periodic; the concern is the reporting requirement is ongoing unless the political fund is terminated or forced to dissolve.

-26-

Periodic reporting requirements are not per se invalid; but are subject to strict scrutiny, at least when the duration of those requirements is ongoing and indefinite.

A state should not be able to sidestep strict scrutiny analysis simply by labeling burdensome regulations as a "disclosure law," when the effect, if not the design, is to discourage corporate speech. See generally Fed. Election Comm'n v. Mass. Citizens for Life, Inc., 479 U.S. 238, 262 (1986) (engaging in strict scrutiny when reviewing a federal campaign law even though the government claimed the law implicated a disclosure interest); Nat'l Right to Life Political Action Comm. v. Connor, 323 F.3d 684, 694-95 & n.11 (8th Cir. 2003) (discussing strict scrutiny for a law implicating the state's disclosure interest because "state election laws that severely restrict the right of association by attempting to regulate the internal affairs of political organizations must be narrowly drawn to serve a compelling state interest"). Allowing such a characterization of our review process risks transforming First Amendment jurisprudence into a legislative labeling exercise.

Assuming arguendo exacting scrutiny is appropriate, the law still fails because Minnesota is unable to show a substantial relation between its ongoing reporting requirement and any important governmental interest. Though less rigorous than strict scrutiny, exacting scrutiny is more than a rubber stamp. See Buckley, 424 U.S. at 64, 66 (describing exacting scrutiny as a "strict test" requiring more than "a mere showing of some legitimate governmental interest"); Elrod v. Burns, 427 U.S. 347, 362-63 (1976) (noting the "[s]tate may not choose means that unnecessarily restrict constitutionally protected liberty" nor choose a regulatory scheme broadly stifling speech if the state has available a "less drastic way of satisfying its legitimate interests") (quoting Kusper v. Pontikes, 414 U.S. 51, 59 (1973) (internal quotation marks omitted)). Provisions "no more than tenuously related to the substantial interests disclosure serves . . . fail exacting scrutiny." Buckley v. Am. Constitutional Law Found. (ACLF), 525 U.S. 182, 204 (1999) (internal marks omitted).

-27-

Each of Minnesota's provisions should first be reviewed separately to determine whether each regulation is substantially related and necessary to accomplish the identified disclosure interests, see ACLF, 525 U.S. at 201-203 (concluding certain aspects of Colorado's law governing disclosure requirements for ballot-initiative proponents failed exacting scrutiny because the state's important interests were adequately met through other valid aspects of the law), and it is Minnesota's burden to establish the required relationship, see Elrod, 427 U.S. at 362 ("The interest advanced must be paramount, one of vital importance, and the burden is on the government to show the existence of such an interest."). For the reasons discussed above, it is doubtful Minnesota can justify the ongoing reporting requirement.

Under either strict or exacting scrutiny, I would hold Minnesota Citizens is likely to prevail on the merits of its challenge to Minnesota's corporate independent expenditure law, and I would reverse the district court's denial of the preliminary injunction. See Phelps-Roper v. Nixon, 545 F.3d 685, 690 (8th Cir. 2008) (reasoning that likely success on the merits in a First Amendment challenge often establishes irreparable harm, a balance of equities in favor of freedom of expression, and public interest). I respectfully dissent from Part II.B. of the majority's opinion.

**Part II.C.**

I concur with the majority's judgment in Part II.C., affirming the district court's refusal to enjoin Minnesota's ban on direct corporate contributions to candidates and affiliated entities. See § 211B.15, subdiv. 2. In Citizens United, the Supreme Court did not explicitly overrule Fed. Election Comm'n v. Beaumont, 539 U.S. 146 (2003), or the Court's equal protection holding in Austin v. Mich. Chamber of Commerce, 494 U.S. 652 (1990), overruled in part by Citizens United, 120 S. Ct. at 913. Because the Supreme Court has instructed courts to wait for it to overrule its own decisions, see Agostini v. Felton, 521 U.S. 203, 237-38 (1997), the district court did not abuse

its discretion in determining Minnesota Citizens is unlikely to win on the merits of this claim.

I write separately to make two observations. First, Citizen United's outright rejection of the government's anti-distortion rationale, see id. at 130 S. Ct. at 904, as well as the Court's admonition that "the State cannot exact as the price of [state-conferred corporate] advantages the forfeiture of First Amendment rights," Id. at 905 (quoting Austin, 494 U.S. at 680 (Scalia, J., dissenting) (internal quotation marks omitted)), casts severe doubt on Beaumont and Austin, leaving the cases' respective precedential value on shaky ground. See Beaumont, 539 U.S. at 164-65 (Thomas, J., dissenting) (articulating the belief that all campaign finance laws are subject to strict scrutiny and that the Colorado contribution ban was "not narrowly tailored to meet any relevant compelling state interest"); id. at 164 (Kennedy, J., concurring) ("Were we presented with a case in which the distinction between contributions and expenditures under the whole scheme of campaign finance regulation were under review, I might join Justice Thomas' dissenting opinion."); Austin, 494 U.S. at 665-66 (incorporating much of the Court's now-overruled First Amendment analysis into its equal protection analysis); see also Dallman v. Ritter, 225 P.3d 610, 634-35 (Colo. 2010) (holding a state law allowing corporations to contribute to candidates, but forbidding labor unions from doing the same violated the Equal Protection Clause of the Fourteenth Amendment).

Second, the fact the district court's conclusion does not rise to an abuse of discretion does not mean Beaumont and Austin compel an ultimate holding in favor of Minnesota on this issue. Minnesota Citizens may develop a factual record demonstrating Minnesota's ban on corporate expenditures is not "closely drawn" to a "sufficiently important interest." See Beaumont, 539 U.S. at 162 (quotation omitted). The district court should also be mindful that even under Austin, strict scrutiny is appropriate when reviewing the merits of Minnesota Citizens' equal protection challenge, and it is Minnesota's burden to prove the differences between

corporations and unions articulated in <u>Austin</u> apply under the facts of this case. <u>See Austin</u>, 494 U.S. at 666.

**<u>Conclusion</u>**

I would reverse the district court's denial of a preliminary injunction, because I believe Minnesota Citizens is likely to prevail on the merits of its claim that Minnesota's corporate independent expenditure law violates Minnesota Citizens' First Amendment rights.

_____